Jordan Fletcher
FLETCHER LAW PLLC
246 Fifth Avenue, 3rd Floor
New York, NY 10001
Tel: (212) 320-8945
Fax: (347) 983-0046
jordan@fletcherlaw.co

Linda Joy Kattwinkel (admitted *pro hac vice*)
OWEN, WICKERSHAM & ERICKSON, P.C.
One Concord Center
2300 Clayton Road, Suite 1400
Concord, CA 94520
Tel: (415) 882-3200
ljk@owe.com

*Attorneys for Plaintiff Michael A. Hayden*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MICHAEL A. HAYDEN, | Case No. 21 Civ. 10249 (LGS) |
| Plaintiff, | |
| v. | |
| JEFF KOONS and JEFF KOONS LLC, | |
| Defendants. | |

**PLAINTIFF MICHAEL A. HAYDEN'S**
**MEMORANDUM OF LAW IN SUPPORT OF**
**<u>MOTION FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT…………………………………………….…………...1

BACKGROUND…………………………………………………………………………..1

A. Plaintiff Michael A. Hayden…………………………………………….………...1

B. The Hayden Work……………………………………………………………….…..2

C. Copyright Status of the Hayden Work Under Italian Law……………………………3

D. Defendant Jeff Koons and the Infringing Works……………………………………4

    1. The *Made in Heaven* Billboard………………………………………………..5

    2. *Jeff and Ilona (Made in Heaven)*……………………………………………6

    3. *Jeff in the Position of Adam*…………………………………………………6

E. Website Use of the Infringing Works by Defendants…………………………..……7

F. Mr. Hayden's Discovery of the Infringing Works…………………………..……7

G. Defendants Continued to Infringe Willfully After Being Contacted by Mr. Hayden………..8

LEGAL STANDARD……………………………………...……………………….……9

ARGUMENT………………………………………...……………………………..……9

A. The Koons Works Willfully Infringe the Hayden Work……………………………9

B. Defendants Have Violated Mr. Hayden's Rights Under the DMCA …………………12

C. Mr. Koons Has Violated Mr. Hayden's Rights Under VARA……………………13

D. Defendants' Fair Use Defense Fails as a Matter of Law……………………..………15

    1. First Factor: Purpose and Character of the Use………………………..………15

        i. Mr. Koons' Use Was Not Transformative………..……..………………15

            a. Koons' Use Embodies the Same Expressive Character…………….……………16

            b. Koons' Use Is for the Exact Same Purpose and Meaning…………………..………19

        ii. The Infringing Works Were Created for a Commercial Purpose………………..……21

    2. Second Factor: The Nature of the Copyrighted Work……………………………21

    3. Third Factor: Amount and Substantiality of Use……………………………22

    4. Fourth Factor: Market Effects………………………………………………....24

E. Hayden's Claims Were Timely Filed………………………………………...………27

CONCLUSION…………………………………………………………………27

# TABLE OF AUTHORITIES

## Cases

*Agence France Presse v. Morel*, 10 Civ. 2730, 2014 WL 3963124 (S.D.N.Y. Aug. 13, 2014)... 12

*Agence France Presse v. Morel*, 769 F. Supp. 2d 295 (S.D.N.Y. 2011) ...................................... 13

*American Geophysical Union v. Texaco Inc.*, 60 F.3d 913 (2d Cir. 1994)............................ 21, 25

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................................. 9

*Authors Guild, Inc. v. Google, Inc.*, 804 F.3d 202 (2d Cir. 2015) ................................................ 15

*Authors Guild, Inc. v. Hathitrust*, 755 F.3d 87 (2d Cir. 2014) .................................................... 24

*Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605 (2d Cir. 2006) ........................ 15

*Blanch v. Koons*, 467 F.3d 244 (2d Cir. 2006) ..................................................................... 15, 21

*Blanch v. Koons*, 485 F. Supp. 2d 516 (S.D.N.Y. 2007). ............................................................. 4

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) ....................................... 16, 20, 25, 26

*Castle Rock Entertain. v. Carol Publish. Group*, 150 F.3d 132 (2d Cir. 1998) .......................... 25

*Davis v. The Gap, Inc.* 246 F.3d 152 (2d Cir. 2001) ................................................................... 15

*Dr. Seuss Enters., L.P. v. ComicMix LLC*, 983 F.3d 443 (9th Cir. 2020) ............................. 18, 26

*Ferdman v. CBS Interactive, Inc.*, 342 F. Supp. 3d 515 (S.D.N.Y. 2018)................................... 25

*Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, 28 N.Y.3d 583 (N.Y. 2016).................................... 14

*Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169 (2d Cir. 2018)................................. 24, 25

*Friedman v. Guetta*, 10 Civ. 14, 2011 WL 3510890 (C.D. Cal. May 27, 2011)......................... 11

*Gaylord v. U.S.*, 595 F.3d 1364 (Fed. Cir. 2010)........................................................................ 18

*Graham v. Prince*, 265 F. Supp. 3d 366 (S.D.N.Y. 2017)..................................................... 20, 21

*Guzman v. N.M. State Dep't of Cultural Affair*, 534 F. Supp. 3d 1375 (D.N.M. 2021).............. 14

*Hamil Am. Inc. v. GFI*, 193 F.3d 92 (2d Cir. 1999)...................................................................... 9

*Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539 (1985) .................................... 23

*Hayden v. Koons*, 21 Civ. 10249, 2022 WL 2819364 (S.D.N.Y. Jul. 18., 2022)....... 10, 13, 14, 22

*Heublein, Inc. v. United States*, 996 F.2d 1455 (2d Cir. 1993)...................................................... 9

*Janik v. SMG Media, Inc.*, 16 Civ. 7308, 2018 WL 345111 (S.D.N.Y. Jan. 10, 2018)............... 13

*Kepner-Tregoe, Inc. v. Vroom*, 186 F.3d 283 (2d Cir. 1999) ...................................................... 11

*Knitwaves, Inc. v. Lollytogs, Ltd.*, 71 F.3d 996 (2d Cir. 1995)................................................... 11

*Leon v. Murphy*, 988 F.2d 303 (2d Cir. 1993) .............................................................................. 9

*Leveyfilm, Inc. v. Fox Sports Interactive Media, LLC*, 999 F. Supp. 2d 1098 (N.D. Ill. 2014).... 13

*Mango v. Buzzfeed, Inc.*, 356 F. Supp. 3d 368 (S.D.N.Y. 2019) ................................................ 13

*Nat'l Academy of Television Arts & Sciences, Inc. v. Multimedia Sys. Design, Inc.*, 551 F. Supp. 3d 408 (S.D.N.Y. 2021) .......................................................................... 15, 17, 24

*Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57 (2d Cir. 2010) ................ 10

*Psihoyos v. John F. Wiley & Sons, Inc.*, 748 F.3d 120 (2d Cir. 2014) ......................................... 27

*Ringgold v. Black Entertainment Tel., Inc.*, 126 F.3d 70 (2d Cir. 1997) ..................................... 20

*Rogers v. Koons*, 960 F.2d 306 (2d Cir. 1992) ................................................................... passim

*Salinger v. Random House, Inc.*, 811 F.2d 90 (2d Cir. 1987) ...................................................... 25

*Sohm v. Scholastic Inc.*, 959 F.3d 39 (2d Cir. 2020) ................................................................... 27

*TCA Television Corp. v. McCollum*, 839 F.3d 168 (2d. Cir. 2016) ............................................... 9

*The Andy Warhol Found. for Visual Arts v. Goldsmith*, 11 F.4th 26 (2d Cir. 2021) ............. passim

*United Feature Syndicate, Inc. v. Koons*, 817 F. Supp. 370 (S.D.N.Y. 1993) ...................... 17, 21

*Ward v. Nat'I Geographic Soc'y,* 208 F. Supp. 2d 429 (S.D.N.Y. 2002) .................................... 12

*Weissmann v. Freeman*, 868 F.2d 1313 (2d Cir. 1989) ............................................................... 20

*Worldwide Church v. Philadelphia Church*, 227 F. 3d 1110 (9th Cir. 2000) ............................. 20

## Statutes

17 U.S.C. § 106A(c)(3) ................................................................................................................. 14

17 U.S.C. § 106A(d)(2) ................................................................................................................ 14

17 U.S.C. § 107 ....................................................................................................................... 15, 19

17 U.S.C. § 1202(c)(2) ................................................................................................................. 12

17 U.S.C. § 1202(c)(3) ................................................................................................................. 12

## Other Authorities

Jane C. Ginsburg, *Fair Use Factor Four Revisited: Valuing the "Value of the Copyrighted Work."* JOURNAL OF THE COPYRIGHT SOCIETY OF THE U.S.A., VOL. 67, P. 19, 2020; COLUMBIA PUBLIC LAW RESEARCH PAPER NO. 14-653 (2020) ......................................................... 26

## Rules

Fed. R. Civ. P. 56(c) ...................................................................................................................... 9

## PRELMINARY STATEMENT

Jeff Koons, one of the world's most famous – and infamous – appropriation artists, has been sued for copyright infringement repeatedly in the United States and abroad for reproducing the works of other artists without permission or credit. He has been found liable for infringement multiple times. This case arises out of Koons' similar misappropriation of plaintiff Michael A. Hayden's original sculptural artwork ("Hayden Work").

Based on all the evidence of record, Hayden is entitled to judgment as a matter of law that (i) three of Koons's artworks (the "Infringing Works") willfully infringe the Hayden Work; (ii) defendants Koons and Jeff Koons LLC (together, "Defendants") violated section 1202(a) of the Digital Millennium Copyright Act ("DMCA"); (iii) Koons violated Hayden's right of authorship under the Visual Artists Rights Act ("VARA"); (iv) Defendants' fair use defense fails; and (v) Hayden's lawsuit was timely filed.

## BACKGROUND

### A.    Plaintiff Michael A. Hayden

Hayden is a United States citizen. (Plaintiff's Rule 56.1 Statement ("Pl.'s 56.1") ¶ 5.) Since the early 1980s, Hayden has been a visual artist creating fine art and other creative works in various media, including paintings, sculptures, artistic interior installations, interior design, and architectural designs. (*Id.* ¶ 10.) Hayden has sold numerous paintings, artworks, and art installations to private collectors and commercial retail establishments. (*Id.*)  His artwork has been exhibited publicly in the United States and Nicaragua, at art fairs, in galleries, and at an art school. (*Id.*)

From 1980 to 2007, Hayden resided primarily in Italy, in or near Rome. (*Id.* ¶ 5.) During that time, he worked as a set and prop designer for live theatre companies and as a self-employed

visual artist. (*Id.* ¶ 8.) He also worked in interior design, residential architecture, construction, and remodeling. (*Id.*)

**B.**    **The Hayden Work**

In the late 1980s, Hayden created several sculptural projects for the Italian production company Diva Futura. (*Id.* ¶ 11.) Diva Futura was co-owned by the famous Hungarian-born, Italian adult erotic performer, Ilona Staller, who performed in live theatre and films under the stage name "Cicciolina," and Ricardo Schicchi, Staller's manager, director, and photographer of much of her erotic work. (*Id.* ¶¶ 11-13.) Staller was also, at that time, a member of the Italian Parliament. (*Id.* ¶ 12.) Hayden's sculptures for Diva Futura were used in connection with Staller's live adult performances. Hayden was paid in cash for these works by Schicchi. (*Id.* ¶ 15.)

In 1988, aware that Staller was fond of snakes, Hayden created a large, original, three-dimensional sculptural work depicting a giant serpent wrapped around a pedestal of boulders (*i.e.*, the Hayden Work). (*Id.* ¶¶ 16-17.) He created the Hayden Work entirely by himself, over the course of several weeks, in a storeroom in the basement of the building where he lived in Rome. (*Id.* ¶ 17.) He made it with Styrofoam, which he molded and shaped using a knife, metal brushes, and sandpaper. (*Id.* ¶ 18.) Hayden then applied glue, gauze, plaster, and paint of various colors, including a base of blues, greens, and brown, along with gold and copper highlights. (*Id.*) The overall dimensions of the Hayden Work are approximately two meters (6.56 feet) long, by one meter (3.28 feet) wide, by 60 centimeters (1.96 feet) tall. (*Id.*)

After finishing the Hayden Work, Hayden approached Schicchi to inquire whether Diva Futura might purchase the Hayden Work as a platform upon which Staller could perform her erotic performances. (*Id.* ¶ 20.) Schicchi agreed, and Diva Futura paid Hayden $900 cash for the sculpture. (*Id.*) Hayden may have signed a simple receipt acknowledging the transaction, however

there was no formal contract between Hayden and Diva Futura concerning exploitation of the Hayden Work or the copyright therein. (*Id.*) Hayden did not intend that the Hayden Work would be used by anyone other than Diva Futura. (*Id.*) He did not give written or verbal permission for Diva Futura to authorize third parties to use, reproduce, create derivatives of the Hayden Work. (*Id.*)

The Hayden Work was the last project that Hayden ever created for Diva Futura, Staller, or Schicchi, and after the sale of the sculpture he had no further communications with Ms. Staller or Mr. Schicchi. (*Id.* ¶ 21.) In 2007, Hayden left Italy and moved to Nicaragua, where he lived until July 2022. (*Id.* ¶ 6.)

## C.    Copyright Status of the Hayden Work Under Italian Law

Under Italian Law, which applied to the terms of sale of the Hayden Work from Hayden to Diva Futura, absent written documents proving a transfer of specific rights, none of the exclusive rights conferred under Italian copyright law to Hayden – including the right to make reproductions, the right to perform, the right to communicate to the public (including digital distribution), the rights to rent and to loan, and the rights to all other forms of economic exploitation, including the right to make derivative works – were transferred to Diva Futura in connection with the transaction. (*Id.* ¶¶ 23-25, 27.) Third parties were not permitted to make derivative works of the Hayden Work, either on their own initiative or on the basis of any purported authority from Diva Futura. (*Id.* ¶ 27.)

At most, according to one Italian court's analysis, Diva Futura *may* have implicitly gained the authority to exhibit the Hayden Work publicly. (*Id.* ¶ 26.) And, according to one Italian commentator (though never any Court), Diva Futura *may* have implicitly gained the authority to create a "thumb-nail" or other straightforward visual copy of the Hayden Work *solely to facilitate*

*a subsequent sale of the physical object* of the Hayden Work. (*Id*.) However, under Italian law, these permissions – if they did exist – would have been unrelated to any of the exclusive rights of an author under copyright; rather, they would have arisen from the separate "bundle" of rights belonging to the owner of a physical object. (*Id*.)

D.    <u>**Defendant Jeff Koons and the Infringing Works**</u>

Koons is one of the most controversial living artists in the world and is known widely as an "appropriation artist." *Blanch v. Koons*, 485 F. Supp. 2d 516, 518 (S.D.N.Y. 2007). As described by United States District Judge Louis L. Stanton in his 2007 opinion in *Blanch v. Koons*, "[a]ppropriation artists take other artists' work and use it in their own art, appropriating and incorporating it in their own product with or without changes. Because of this appropriation, often . . . done without giving credit to the original artist, the appropriation artists can expect that their work may attract lawsuits." *Id.* Indeed, Koons has been sued numerous times, and has been found liable for infringement under circumstances essentially the same as this case. *Id.*

In 1989 and 1990, Koons traveled to Italy multiple times to be photographed with Staller in sexually explicit positions, in preparation for two upcoming exhibitions and a new series of works, which would be called *Made in Heaven*. (Pl.'s 56.1 ¶ 31.) In accordance with Koons' specific request, the photo sessions occurred on Staller's own sets at Schicchi's studio and incorporated a variety of the theatrical backdrops, props, and costumes that Staller had used previously in her other erotic work. (*Id*.)

The Hayden Work was used by Koons and Staller during their photo sessions and appeared in some of Schicchi's photographs. (*Id.* ¶ 32.) Koons subsequently incorporated depictions and/or derivative versions of the Hayden Work into at least six different artworks that became part of his *Made in Heaven* series. (*Id.* ¶ 33.) Three of these derivatives of the Hayden Work are the subject

of this lawsuit: *Made in Heaven*, *Jeff and Ilona (Made in Heaven)*, and *Jeff in the Position of Adam* (altogether, the "Infringing Works"). (*Id.* ¶ 34.)

Koons had his lawyers draft at least one written contract to memorialize the terms of agreement between Koons and Diva Futura. (*Id.* ¶ 35.) Under the terms of that contract, Koons received the negatives to twenty photographs shot by Schicchi. (*Id.*) Although the contract granted Koons ownership rights to the photographs and their negatives, it did not specifically purport to grant Koons the rights to use, display, reproduce, or create derivative works based upon any third party-owned materials that might be depicted in those photographs. (*Id.*)

At no time did Koons seek or obtain verbal or written authorization from Hayden to reproduce or display the Hayden Work, distribute copies of the Hayden Work to the public, or prepare derivative works based upon the Hayden Work. (*Id.* ¶ 36.) At no time did Koons ask Schicchi who had created the Hayden Work. (*Id.*)

The Infringing Works were sold to collectors for many hundreds of thousands of dollars. (*Id.* ¶ 87.) The three editions of the *Made in Heaven* Billboard sold for a total of approximately $262,500 in 1991 and 1993; *Jeff in the Position of Adam* sold for $90,000 in 1992; and *Jeff and Ilona (Made in Heaven)* sold for $440,000 in 1991. (*Id.*)

   1.    The *Made in Heaven* Billboard

The Infringing Work *Made in Heaven* is a lithograph billboard ("*Made in Heaven* Billboard") created in 1989 and measuring approximately 10 feet by 22.67 feet. (*Id.* ¶ 37.) To create the *Made in Heaven* Billboard, Koons hired an outside company to make color separations of an original photograph taken by Schicchi in order to print the photograph onto large format paper, which was mounted using glue to a billboard frame on top of a building in lower Manhattan, New York City. (*Id.* ¶ 38.) The *Made in Heaven* Billboard was first exhibited as part of a show put

on by the Whitney Museum of American Art in late 1989 called *"Image World,"* and its three editions have been exhibited numerous times in museums in Europe and the United States between 1989 and 2015. (*Id.* ¶¶ 39-40.)

2.     *Jeff and Ilona (Made in Heaven)*

The Infringing Work *Jeff and Ilona* (*Made in Heaven)* is a single "polychromed" (*i.e.*, painted) wood sculptural work created in 1990 and measuring 5.5 feet by 9.5 feet by 5.4 feet. (*Id.* ¶¶ 41-42.) To create *Jeff and Ilona (Made in Heaven)*, Koons made drawings based on the original photographs taken by Schicchi and then hired an outside company to render the drawings three-dimensionally into a clay model. (*Id.* ¶ 42.) The clay model was then reproduced in wood and painted in a variety of colors, including gold, orange, green, and turquoise by hired artisans. (*Id.*) *Jeff and Ilona (Made in Heaven)* premiered at the Venice Biennale in 1990.  It has been publicly exhibited several times since then, including since 2020 in Aachen, Germany. (*Id.* ¶ 43.)

3.     *Jeff in the Position of Adam*

The Infringing Work *Jeff in the Position of Adam* is a single work of oil inks on canvas created in 1990, measuring 8 feet by 12 feet. (*Id.* ¶ 44.) To create *Jeff in the Position of Adam*, Koons had Schicchi's photograph reproduced onto canvas using a printing process similar to an ink jet machine. (*Id.* ¶ 45.) *Jeff in the Position of Adam* has been exhibited publicly on numerous occasions over the last twenty years. (*Id.* ¶ 46.) In 2019, Defendants actively participated in and assisted with a museum exhibition in Mexico City that featured *Jeff in the Position of Adam.* (*Id.*)

E.     **Website Use of the Infringing Works by Defendants**

Images of all three Infringing Works have been publicly displayed on the website www.jeffkoons.com ("Koons Website") continuously for at least several years, including during the three-year period immediately prior to the filing of this lawsuit. (*Id.* ¶ 47.) The Koons Website

is owned by defendant Jeff Koons LLC, which is wholly owned and managed by Koons. (*Id*.) Images of the Infringing Works were publicly displayed on the Koons Website as of April 2020, when counsel for Hayden sent a cease-and-desist letter to Koons; they were displayed on the Koons Website on the day this lawsuit was filed in December 2021; and they are currently displayed on the Koons Website. (*Id.* ¶ 48.)

The website displays of the Infringing Works by Jeff Koons LLC and Koons are and have been accompanied by immediately-adjacent copyright icons indicating that copyrights in the Infringing Works are owned by Koons. (*Id.* ¶ 49.) The displays are also accompanied by text and context indicating that Koons is the author of the Infringing Works. (*Id.* ¶ 50.) These include: (a) the name "JEFF KOONS" appears in large font at the top of the webpages on which each of the Infringing Works are displayed, immediately above the images of the Infringing Works; (b) the web address and landing page of the Koons Website contain Koons' full name; (c) the Koons Website is comprised of various artworks by and biographical information about Koons; (d) no other artists' artworks are displayed on the Koons Website. (*Id*.)

The Koons Website does not and has never identified Hayden as the author or copyright owner of the Infringing Works or the portions of those works depicting the Hayden Work. (*Id.* ¶ 51.)

## F.   Mr. Hayden's Discovery of the Infringing Works

Hayden did not become aware of Koons' Infringing Works until April 2019, when his then-business partner, Sergio Meschino, alerted him to a news article, dated April 30, 2019, published in the online version of an Italian daily publication called *La Repubblica*. (*Id.* ¶¶ 56-57.) The article displayed an image of the *Made in Heaven* Billboard alongside coverage of a legal dispute between Staller and Sotheby's auction house. (*Id.* ¶ 57.)

Prior to this discovery, Hayden had no knowledge of the Infringing Works, nor had he communicated with Staller or Schicchi since approximately 1988. (*Id.* ¶ 58.) Although Hayden knows Staller to be a celebrity and household name in Italy, he does not believe that many Italians during the period he lived in Italy, *i.e.*, 1980 to 2007, knew about Koons or his artwork. (*Id.* ¶ 59.) Mr. Meschino, who is an Italian citizen, also was not previously aware of the Infringing Works. (*Id.* ¶ 60.) Before he saw the *La Repubblica* article, Meschino does not believe that he had ever heard of Koons. (*Id.*) Meschino does not believe that many every-day Italian people have heard of Koons or are very familiar with his artwork. (*Id.*)

**G.    Defendants Continued to Infringe Willfully After Being Contacted by Mr. Hayden**

In late March 2020, counsel for Hayden sent a cease-and-desist letter to counsel for Koons about the infringing conduct alleged in this lawsuit, and Koons became aware of Hayden's allegations at that time. (*Id.* ¶¶ 61-62.) Despite his actual knowledge of Hayden's allegations, displays of the Infringing Works on the Koons Website did not change; the site continued to identify Koons as the copyright owner and author of the Infringing Works. (*Id.* ¶ 63.) At no time since he first learned about Hayden's allegations did Koons instruct the manager of Jeff Koons LLC to change or remove the displays of the Infringing Works on the Koons Website, even though Koons has the authority to do so and has in the past directed certain other images to be removed. (*Id.* ¶¶ 64-65.)

Prior to this lawsuit, Koons was familiar with the legal concepts of copyright infringement and the fair use defense. (*Id.* ¶ 106.) In fact, Koons has been sued for copyright infringement multiple times in the United States and abroad. (*Id.* ¶¶ 107-09.) In several of the U.S.-based cases, Koons has invoked fair use as a defense to copyright infringement. (*Id.*) The lawsuits *Rogers v. Koons* and *United Features Syndicate v. Koons* were filed in or about 1989 and involved claims

for copyright infringement, and Koons raised (and lost) a fair use defense in each one. (*Id.*) Koons was therefore aware of the concept of copyright infringement at least as early as 1989. (*Id.* ¶ 109.)

## LEGAL STANDARD

Summary judgment is appropriate if "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment should be granted when, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir. 1993). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

A court faced with cross-motions for summary judgment "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993). "Courts most frequently address a proffered fair use defense at summary judgment" and may decide the issue if there are no genuine issues of fact. *TCA Television Corp. v. McCollum*, 839 F.3d 168, 178 (2d. Cir. 2016).

## ARGUMENT

### A.    The Koons Works Willfully Infringe the Hayden Work

To establish copyright infringement, a plaintiff must show "both ownership of a copyright and unauthorized copying by the defendant." *Hamil Am. Inc. v. GFI*, 193 F.3d 92, 98 (2d Cir. 1999). A plaintiff must demonstrate that "(1) the defendant has actually copied the plaintiff's work; and (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectable elements of plaintiff's." *Id*. at 99. *See also Peter F. Gaito Architecture, LLC v.*

*Simone Dev. Corp.*, 602 F.3d 57, 63 (2d Cir. 2010). Substantial similarity may be resolved as a matter of law where "access to the copyrighted work is conceded, and the accused work is so substantially similar to the copyrighted work that reasonable jurors could not differ on this issue." *The Andy Warhol Found. for Visual Arts v. Goldsmith*, 11 F.4th 26, 53 (2d Cir. 2021) (hereinafter "*Warhol*") (quoting *Rogers v. Koons*, 960 F.2d 306, 307 (2d Cir. 1992)).

Hayden owns a registered copyright in the Hayden Work. (Pl.'s 56.1 ¶¶ 110-11), and this Court has already held that the Hayden Work is a "sculptural work of artistic craftmanship" that is copyrightable. *Hayden v. Koons*, 21 Civ. 10249, 2022 WL 2819364, at *3 (S.D.N.Y. Jul. 18., 2022). Further, Koons has admitted that he created the Infringing Works based on Schicchi's photographs depicting the actual Hayden Work. (Pl.'s 56.1 ¶¶ 32-34, 38, 42, 45.) *Cf. Rogers*, 960 F.2d at 307 ("Koons admittedly gave a copy of the photograph to the Italian artisans with the explicit instruction that the work be copied. Moreover, the importance of copying the very details of the photograph that embodied plaintiff's original contribution – the poses, the shading, the expressions – was stressed by Koons throughout the creation of the sculpture."). It is undisputed that Koons did not seek Hayden's permission, explicit or implied, to create the Infringing Works and that Diva Futura had no authority to grant Koons permission on Hayden's behalf. (Pl.'s 56.1 ¶ 36.) It is also undisputed that implied copyright licenses do not exist under Italian law. (*Id.* ¶¶ 24-25, 27.)[1]

Further, all three Infringing Works closely reproduce the colors, highlights, shadows, form, curvature, undulations, surface features, and surface markings of the Hayden Work's serpent and boulder. (*Id.* ¶¶ 66, 69, 72.). *See also Warhol*, 11 F.4th at 53 ("[W]orks are substantially similar when an average lay observer would recognize the alleged copy as having been appropriated from

---

[1] Defendants' implied license affirmative defense therefore must be denied as a matter of law.

the copyrighted work.") (quoting *Knitwaves, Inc. v. Lollytogs, Ltd.*, 71 F.3d 996, 1003 (2d Cir.

1995)); *Rogers*, 960 F.2d at 307 ("Substantial similarity does not require literally identical copying

of every detail . . . . [T]he inquiry is whether the ordinary observer, unless he set out to detect the

disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same."

(internal quotation marks and citation omitted)); *id*. at 308 ("no copier may defend the act of

plagiarism by pointing out how much of the copy he has not pirated"). Analogous cases in which

appropriation artists were found liable for copyright infringement support the same result here.

*See*, e.g., *Friedman v. Guetta*, 10 Civ. 14, 2011 WL 3510890, at *4 (C.D. Cal. May 27, 2011) ("no

reasonable fact finder could find that the works are not substantially similar, and therefore Plaintiff

is entitled to summary judgment."):



(original work on the left; infringing work at right).

Finally, at least since receiving Hayden's cease and desist letter in April 2020, Defendants'

continued infringement has been willful. (Pl.'s 56.1 ¶ 61.) Despite Koons' extraordinary

familiarity with copyright infringement and fair use concepts, he continued to display the

Infringing Works on the Koons Website, notwithstanding (a) his actual knowledge of Hayden's

claims, (b) his full control over the website's content, and (c) his past directions that the Koons

Website should not display certain other images that he believed were inappropriate for public

display. (*Id*. ¶¶ 47, 62-65, 106-09.) *See also Kepner-Tregoe, Inc. v. Vroom*, 186 F.3d 283, 288 (2d

Cir. 1999) ("The standard for willfulness is whether the defendant had knowledge that [his]

conduct represented infringement or perhaps recklessly disregarded the possibility." (internal quotation marks omitted)); *EMI Ent. World, Inc. v. Karen Records, Inc.*, 806 F. Supp. 2d 697, 704 (S.D.N.Y. 2011) ("Given that each of these acts from which courts have inferred willfulness – industry experience and copyright ownership; prior lawsuits regarding similar practices; and a specific warning – is present here, [plaintiff] has presented strong circumstantial evidence of willfulness.").

**B.**    **Defendants Have Violated Mr. Hayden's Rights Under the DMCA**

Section 1202(a) of the DMCA, makes it unlawful to "knowingly, and with the intent to 'induce, enable, facilitate, or conceal infringement,' either 'provide' or 'distribute'" false copyright management information ("CMI"). *Agence France Presse v. Morel*, 10 Civ. 2730, 2014 WL 3963124, at * 7 (S.D.N.Y. Aug. 13, 2014). Thus, "the defendant must both know that the CMI is false, and provide or distribute the false CMI with the intent to induce, enable, facilitate, or conceal infringement." *Id.* (citing *Ward v. Nat'l Geographic Soc'y,* 208 F. Supp. 2d 429, 449 (S.D.N.Y. 2002)). The definition of CMI includes "[t]he name of, and other identifying information about, the author of a work," and "[t]he name of, and other identifying information about, the copyright owner of the work, including the information set forth in a notice of copyright." 17 U.S.C. § 1202(c)(2), (3). *See also Agence France Presse*, 2014 WL 3963124 at *7.

Defendants have displayed all three Infringing Works on the Koons Website alongside false CMI – (i) copyright symbols and affirmative authorship claims placed immediately below and next to the images; and (ii) overall context, including the website title, website content, and Koons' name in large font at the top of each webpage – identifying Koons as the author and copyright owner of the Infringing Works, including those portions of the Infringing Works that reproduce the Hayden Work. (Pl.'s 56.1 ¶¶ 49-50.) *See also Mango v. Buzzfeed, Inc.*, 356 F. Supp.

3d 368, 377 (S.D.N.Y. 2019) ("[T]he DMCA defines information 'conveyed *in connection with* copies' of a work – it does not require the CMI to appear on the work itself.") (quoting *Agence France Presse v. Morel*, 769 F. Supp. 2d 295, 305 (S.D.N.Y. 2011)) (emphasis in original); *Janik v. SMG Media, Inc.*, 16 Civ. 7308, 2018 WL 345111, at *12 (S.D.N.Y. Jan. 10, 2018) (DMCA legislative history explains that "[t]he term 'conveyed' is used in its broadest sense and . . . merely requires that the information be accessible in conjunction with, or appear with, the work being accessed."); *Leveyfilm, Inc. v. Fox Sports Interactive Media, LLC*, 999 F. Supp. 2d 1098, 1102-03 (N.D. Ill. 2014) ("[I]t is 'implausible' that a viewer of the record album would not understand that the credit line 'Photography: Don Levey, Don Levey Studio' on the back of the album also referred to the authorship of the photo on the cover of the album.").

Further, Defendants have displayed and distributed this false CMI with the knowledge that it was false, and with the intent to enable, facilitate and conceal Koons' infringement of Hayden's authorship and copyright. Indeed, even if Koons was unaware that the CMI was false at the time it was posted on the Koons Website, he has admitted that he obtained actual knowledge of Hayden's infringement claims in April 2020. (Pl.'s 56.1 ¶ 62.) Yet Koons took no action to correct the false CMI on the Koons Website or to remove the infringing images. (*Id.* ¶¶ 63-64.) *See Mango*, 356 F. Supp. 3d at 378 (finding *mens rea* satisfied for § 1202(b) CMI removal claim where Defendant removed CMI from an original work despite knowing that it needed permission to display the work).

**C.    Mr. Koons Has Violated Mr. Hayden's Rights Under VARA**

Hayden is entitled to judgment on his VARA authorship claim because (a) he is the author of a work of visual art, *i.e.*, a sculptural work of fine art existing in a single copy, *see Hayden*, 2022 WL 2819364 at *3; (Pl.'s 56.1 ¶ 52); 17 U.S.C. § 101 (definition of "work of visual art");

(b) Koons has claimed or otherwise communicated to the public that Koons is the author of the Infringing Works, including the Hayden Work reproduced therein, (Pl.'s 56.1 ¶ 54); and (c) Koons has never identified Hayden as the author of those portions of the Infringing Works that reproduce the Hayden Work. (*Id.* ¶ 55.). *See also* 17 U.S.C. § 106A(a)(1)(A) and (b).

Although it was created prior to VARA's effective date, the Hayden Work is protected because Hayden never transferred title to any of his rights under copyright law. (Pl.'s 56.1 ¶¶ 20, 24.) Defendants' argument that the word "title" in 17 U.S.C. § 106A(d)(2) refers only to ownership of the physical object comprising an artwork fails for several reasons. As this Court previously suggested, "more [appears to be] required than simply looking to whether a sale or transfer occurred." *Hayden*, 2022 WL 2819364 at *6 (discussing *Guzman v. N.M. State Dep't of Cultural Affair*, 534 F. Supp. 3d 1375, 1382 (D.N.M. 2021)). Property rights are often conceived of as "bundle of sticks" comprising different enumerated rights. *Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, 28 N.Y.3d 583, 624 (N.Y. 2016). The word "title" here – in an *intellectual property* statute – cannot reasonably refer only to sticks related to a physical object. Further, not only does the word "title" in § 106A(d)(2) immediately precede language making the duration of VARA rights coextensive with the duration of fundamental copyrights, but Defendants' contrary interpretation – *i.e.*, that "title" means nothing more than ownership of a physical copy of an artwork – yields non-sensical results: it would mean that an artist who created a work of fine art in multiple copies (*e.g.*, prints, sculptures, photographs) but sold only some of those copies prior to VARA's effective date, was granted VARA authorship rights *only* for the unsold copies. An infringer who falsely claims authorship over an image embodied in, *e.g.*, print 1 of 50 (sold prior to the effective date) would not be liable under VARA, whereas an infringer falsely claiming authorship over the exact same image embodied in print 35 (sold after the effective date) would be liable.

**D.**    **Defendants' Fair Use Defense Fails as a Matter of Law**

"To determine whether a particular use is fair use, courts engage in a case-by-case evaluation using four statutory factors. . . ." *Nat'l Academy of Television Arts & Sciences, Inc. v. Multimedia Sys. Design, Inc.*, 551 F. Supp. 3d 408, 428 (S.D.N.Y. 2021) (citing *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 608 (2d Cir. 2006)). The factors are: "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." *Warhol*, 11 F.4th at 37. "As the Supreme Court has designated fair use an affirmative defense, the party asserting fair use bears the burden of proof." *Authors Guild, Inc. v. Google, Inc.*, 804 F.3d 202, 213 (2d Cir. 2015) (citations omitted).

Here, all four factors weigh decisively against a finding of fair use.

1.    **First Factor: Purpose and Character of the Use**

The first factor, is the "heart of the fair use inquiry." *Blanch v. Koons*, 467 F.3d 244, 251 (2d Cir. 2006) (quoting *Davis v. The Gap, Inc.* 246 F.3d 152, 174 (2d Cir. 2001)). This factor includes two considerations: (i) the transformative nature of the work, and (ii) whether the "use is of a commercial nature or is for nonprofit educational purposes." *Bill Graham*, 448 F.3d at 608 (citing 17 U.S.C. § 107(1)).

i.    Koons' Use Was Not Transformative

To determine whether a secondary use is transformative, a court must consider "whether the new work merely supersede[s] the objects of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning,

or message." *Id.* (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994)). To be transformative, "the secondary work itself must reasonably be perceived as embodying an entirely distinct artistic purpose, one that conveys a new meaning or message separate from its source material." *Warhol*, 11 F.4th at 41 Although the primary work may still be recognizable within the secondary work, "the secondary work's use of its source material" must be "in service of a fundamentally different and new artistic purpose and character, such that the secondary work stands apart from the raw material used to create it." *Id.* at 42 (quotation marks omitted). A "transformative purpose and character must, at a bare minimum, comprise something more than the imposition of another artist's style on the primary work such that the secondary work remains both recognizably deriving from, and retaining the essential elements of, its source material." *Id.*

Here, the undisputed facts demonstrate that the Infringing Works did not physically alter the dominant components of the Hayden Work, nor did they create new symbolic meaning or message distinct from the Hayden Work.

a.    Koons' Use Embodies the Same Expressive Character

Koons' reproduction of the Hayden Work is clearly recognizable in the Infringing Works and not *de minimis*. Each Infringing Work closely reproduces the colors, highlights, shadows, form, curvature, undulations, surface features, and surface markings of the original Hayden Work's serpent and boulder. (Pl.'s 56.1 ¶¶ 66-73.) In fact, with respect to the *Made in Heaven* Billboard and *Jeff in the Position of Adam*, Koons intentionally sought to produce as close to exact replications of the original Hayden Work as possible. (*Id.* ¶¶ 67-68, 70-71.) At most, Koons may have directed cropping of Schicchi's original photographs, and minor retouching to remove small imperfections. (*Id.* ¶¶ 68, 71.) Otherwise, he did not intend, nor did he in fact, change the original representation of the Hayden Work in any way. (*Id.* ¶¶ 67-68, 70-71.) *See also Warhol*, 11 F.4th

at 43 ("the [defendant's] Prince Series retains the essential elements of the Goldsmith Photograph without significantly adding to or altering those elements."); *id.* (holding that "removing certain elements from the [original work], such as depth and contrast, and embellishing the flattened images with loud, unnatural colors" was not sufficiently transformative to support fair use); *Nat'l Academy of Television Arts & Sciences*, 551 F. Supp. 3d at 422 ("a simple side-by-side comparison of the [plaintiff's] Emmy Statuette and the [defendant's] Crony Graphic confirms that the Crony Graphic retains the dominant and essential aesthetic elements of the Emmy Statuette.").

With respect to the sculpture *Jeff and Ilona (Made in Heaven)*, any colors or surface definition that Koons added to the Hayden Work are non-distinguishable from the type of stylizations that the Second Circuit found non-transformative in *Rogers v. Koons*:



(original work on the left; infringing work at right). *See* 960 F.2d at 308 (2d Cir. 1992) ("Koons' additions, such as the flowers in the hair of the couple and the bulbous noses of the puppies, are insufficient to raise a genuine issue of material fact with regard to copying in light of the overwhelming similarity to the protected expression of the original work."). Nor does Koons' addition of new content – *e.g.*, colored flowers on the boulders, protruding red tongue on the serpent, small waves to the base of the Hayden Work, additional portions of snake to the back side of the boulders, and the Koons and Staller figures – alter this analysis. In *United Feature Syndicate, Inc. v. Koons,* for example, Koons' addition of cartoonish figures standing next to the Garfield cartoon character Odie did not qualify for fair use. 817 F. Supp. 370, 378 (S.D.N.Y. 1993) ("The

addition of the two other images does not, in any way, affect the ability of a lay observer to recognize the 'Puppy' as 'Odie.'"):

 

(original work on the left; infringing work at right). Similarly, the Ninth Circuit recently found a *Star Trek*-inspired mashup of Dr. Seuss's *Oh, The Places You'll Go*! to be non-transformative:

 



(original works at left; infringing works at right). *Dr. Seuss Enters., L.P. v. ComicMix LLC*, 983 F.3d 443, 454-55 (9th Cir. 2020). *Cf. Gaylord v. U.S.*, 595 F.3d 1364, 1373-74 (Fed. Cir. 2010):

 

(original work at left; infringing work at right) ("Although the stamp altered the appearance of [the original work] by adding snow and muting the color, these alterations do not impart a different character to the work."); *Warhol*, 11 F.4th at 39 ("Moreover, there exists an entire class of secondary works that add new expression, meaning, or message to their source material but may nonetheless fail to qualify as fair use: *derivative works*.") (emphasis added) (citation and quotation marks omitted); 17 U.S.C. § 107 ("A 'derivative work' is a work based upon one or more preexisting works . . . in which a work may be recast, transformed, or adapted.").

> b.     Koons' Use Is for the Exact Same Purpose and Meaning

In "evaluating the extent to which a work is transformative or derivative (or neither)" the court must also consider "the purpose and character of the primary and secondary works." *Warhol*, 11 F.4th at 40 (quotation marks omitted). The focus of this inquiry is

> not simply on the new work, *i.e.,* on whether that work serves a purpose or conveys an overall expression, meaning, or message different from the copyrighted material it appropriates. Rather, ***the critical inquiry is whether the new work uses the copyrighted material itself for a purpose, or imbues it with a character, different from that for which it was created***.

*TCA Television Corp.*, 839 F.3d at 180 (emphasis added).

Here, the Infringing Works use the Hayden Work for the exact same purpose and meaning as was originally intended: a sculptural work on which Staller would engage in public sexual performances, surrounded by her usual set backdrops and wearing her usual costumes. (Pl.'s 56.1 ¶¶ 74-76.) Koons admitted repeatedly that he wanted to use Staller and her world as a "readymade," *i.e.*, to "capture the quality of [Ms. Staller] – of her being, of her – her sessions, the photographs that [he'd] seen her in," and to "put [himself] in that context with her." (*Id.* ¶ 75.) Koons sought to recreate precisely – using the same sets, costumes, production and post-production staff, and creative decision makers – the look, feel, and meaning of Staller's surreal

theatrical fantasy world, which Koons believed to symbolize innocence and transgression, sensuality and eroticism, and emancipation from sexual guilt and shame. (*Id.* ¶¶ 76-79.)[2] *See Graham v. Prince*, 265 F. Supp. 3d 366, 382 (S.D.N.Y. 2017) ("although an artist's stated intent is not dispositive in determining whether his or her work is transformative, it is also not irrelevant." (quotation marks omitted)). Indeed, the only intended (and objectively apparent) difference in the Infringing Works is that Koons featured himself – as opposed to another performer with whom Staller might have typically worked – as Staller's co-star atop the Hayden Work.[3] (*Id.* ¶¶ 74, 79.) *See Ringgold v. Black Entertainment Tel., Inc.*, 126 F.3d 70, 79 (2d Cir. 1997) ("The defendants have used Ringgold's work for precisely a central purpose for which it was created . . . ."); *Worldwide Church v. Philadelphia Church*, 227 F. 3d 1110, 1117 (9th Cir. 2000) ("[U]se for the same intrinsic purpose as the copyright holder's . . . seriously weakens a claimed fair use." (quotation marks omitted)) (quoting *Weissmann v. Freeman*, 868 F.2d 1313, 1324 (2d Cir. 1989)); *Warhol*, 11 F.4th at 42 ("there can be no meaningful dispute that the overarching purpose and function of the two works at issue here is identical, not merely in the broad sense that they are created as works of visual art, but also in the narrow but essential sense that they are portraits of the same person."); *id.* at 41 ("the bare assertion of a 'higher or different artistic use,' is insufficient to render a work transformative.") (quoting *Rogers*, 960 F.2d at 310); *Campbell*, 510 U.S. at 580 (finding claim of fair use "diminishes accordingly (if it does not vanish)" where infringer selected the original "to avoid the drudgery in working up something fresh.").

---

[2] The Infringing Works were neither comedy nor parody, and Koons did not intend to make fun of or criticize Staller, her performances, her sets, the Hayden Work, or mass media.  (Pl.'s 56.1 ¶ 105.); *Campbell*, 510 U.S. at 580.

[3] Koons decided to incorporate the Hayden Work into his photoshoots with Staller because it was part of her sets and had a useful height and color; any relation to Koons' later-asserted Garden of Eden theme was unintentional and, at first, pure coincidence. (Pl.'s 56.1 ¶ 97.)

ii.    <u>The Infringing Works Were Created for a Commercial Purpose</u>

"The second part of the purpose and character inquiry considers whether the allegedly infringing work was made for a 'commercial' purpose." *Graham*, 265 F. Supp. 3d at 382. Indeed, "[t]he greater the private economic rewards reaped by the secondary user (to the exclusion of broader public benefits), the more likely the first factor will favor the copyright holder and the less likely the use will be considered fair." *Blanch*, 467 F.3d at 253 (quoting *American Geophysical Union v. Texaco Inc.*, 60 F.3d 913 (2d Cir. 1994)).

Without a doubt, Koons used the Hayden Work for a commercial purpose. The Infringing Works sold to collectors for many hundreds of thousands of dollars in the early 1990s, and the *Made in Heaven* series generated substantial controversy and notoriety for Koons and his career. (Pl.'s 56.1 ¶¶ 86-87.) Koons is currently worth more than $100 million, and his income has been derived primarily from sales of his artwork. (*Id.* ¶ 88.) Koons has stated repeatedly that the purpose and effect of the *Made in Heaven* series was to increase his own stardom, to gain larger cultural relevance as an artist, and to "participate [in a dialogue] on a larger cultural stage." (*Id.* ¶¶ 82-85.) *Cf. Rogers,* 960 F.2d at 312 ("there is simply nothing in the record to support a view that Koons produced 'String of Puppies' for anything other than sale as high-priced art."); *United Feature Syndicate, Inc.*, 817 F. Supp. at 379 ("this undisputed evidence strongly indicates that Koons' use of the copyrighted 'Odie' character was 'of a commercial nature' and that Koons stands to profit from his exploitation of the copyrighted material without paying the customary price.").

For all these reasons, the first fair use factor weighs strongly against a finding of fair use.

**2.    Second Factor: The Nature of the Copyrighted Work**

The second fair use factor "directs courts to consider the nature of the copyrighted work, including (1) whether it is expressive or creative . . . or more factual, with a greater leeway being

allowed to a claim of fair use where the work is factual or informational, and (2) whether the work is published or unpublished, with the scope of fair use involving unpublished works being considerably narrower." *Warhol*, 11 F.4th at 45. What's more, where the new work is found not to be transformative, the court should "accord this factor correspondingly greater weight." *Id.*

As this Court has already held, the Hayden Work is both expressive and creative. *Hayden*, 2022 WL 2819364 at *5. It is also unpublished: Hayden never authorized the making or distribution of copies of the Hayden Work. (Pl.'s 56.1 ¶¶ 90-92.) *See also* 17 U.S.C. § 101 (defining "publication" as "the distribution of copies . . . of a work to the public by sale or other transfer of ownership . . . . A *public performance or display* of a work does not itself constitute publication."). Furthermore, Hayden retained for himself all of his exclusive rights under Italian Copyright Law, including all those rights relating to the making or distribution of copies, public display, renting or loaning, and other economic exploitation. (*Id.* ¶¶ 24-25, 91.) Indeed, the only right to reproduce the Hayden Work that Diva Futura arguably *might* have received would have been a non-copyright related permission to display thumbnail images of the Hayden Work solely in furtherance of a subsequent resale of the physical sculpture. (*Id.* ¶ 26.)

Consequently, the second factor weighs strongly against fair use. *See Warhol*, 11 F.4th at 45 ("Having recognized [plaintiff's photograph] as both creative and unpublished, the district court should have found this factor to favor [plaintiff]. . . .").

### 3.  Third Factor: Amount and Substantiality of Use

The third statutory factor asks whether "the amount and substantiality of the portion used in relation to the copyrighted work as a whole . . . are reasonable in relation to the purpose of the copying." *TCA Television Corp.*, 839 F.3d at 185 (quotation marks omitted). In assessing this factor, the court considers "not only the quantity of the materials used but also their quality and

importance." *Id.* ("[The] fact that a substantial portion of the infringing work was copied verbatim is evidence of the qualitative value of the copied material, both to the originator and to the plagiarist who seeks to profit from marketing someone else's copyrighted expression.") (citing *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 565 (1985)).

Koons appropriated the Hayden Work entirely and in detail. The Infringing Work *Jeff and Ilona (Made in Heaven)* incorporates a three-dimensional rendition of 100% of the Hayden Work, and that rendition is a major focus – comprising approximately 65% of the total volume – of Koons' derivative work. (Pl.'s 56.1 ¶ 93.) The *Made in Heaven* Billboard incorporates a two-dimensional reproduction of approximately 80% of the front and side of the Hayden Work, which occupies approximately 40% of the entire *Made in Heaven* Billboard. (*Id.* ¶ 94.) And *Jeff in the Position of Adam* incorporates a two-dimensional reproduction of approximately 60% of the front side of the Hayden Work, which occupies approximately 25% of the entire Koons image. (*Id.* ¶ 95.) The original surface markings and forms, coloring, cross-hatching, and the precise shape and curvature of Hayden's original serpent and rock formations comprise the heart of the Hayden Work, and all are readily visible in each of the Infringing Works. (*Id.* ¶ 96.) *See Warhol*, 11 F.4th at 46 (copyright protection "encompasses [a] photographer's 'posing the subjects, lighting, angle, selection of film and camera, evoking the desired expression, and almost any other variant involved.'") (quoting *Rogers*, 960 F.2d at 307).

Moreover, out of approximately 30 artworks in Koons' *Made in Heaven* series, only six depict the Hayden Work. (Pl.'s 56.1 ¶ 98.) Yet each of the *Made in Heaven* works share similar themes relating – according to Koons – to Adam and Eve, emancipation from the shame of sexuality, and highlighting cultural hypocrisy around sexuality. (*Id.* ¶ 99.) Significantly, Koons believed he was able to communicate these themes successfully in roughly 24 works without

depicting the Hayden Work at all, (*id*.), which means that *no amount of copying* of the Hayden Work was actually necessary to achieve Koons' stated purpose. *See Authors Guild, Inc. v. Hathitrust*, 755 F.3d 87, 98 (2d Cir. 2014) ("The crux of the inquiry is whether no more was taken than necessary.") (quotation marks omitted).

Finally, Koons' belated rationalization that the Hayden Work's serpent provided a convenient link to Garden of Eden themes is irrelevant. Even if Koons wanted to depict a snake, there was no reason he needed to use *Hayden's* snake. *See Warhol*, 11 F.4th at 47 ("Warhol did not use the Goldsmith Photograph simply as a reference or *aide-mémoire* in order to accurately document the physical features of its subject. Instead, the Warhol images are instantly recognizable as depictions or images of the Goldsmith Photograph itself."); *id.* ("Nor can Warhol's appropriation of the Goldsmith Photograph be deemed reasonable in relation to his purpose. While Warhol presumably required a photograph of Prince to create the Prince Series, AWF proffers no reason why he required *Goldsmith*'s photograph."); *Nat'l Academy of Television Arts & Sciences*, 551 F. Supp. 3d at 424 ("Even assuming that Defendant needed to use an image of an award to promote its Crony Awards, Defendant has not shown that it was necessary to use the Emmy Statuette.").

The third factor also weighs strongly against fair use.

### 4.    Fourth Factor: Market Effects

Finally, the fourth fair use factor considers "the effect of the use upon the potential market for or value of the copyrighted work." *Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169, 179 (2d Cir. 2018). "Critically, it requires consideration of not only the ... market harm caused by the particular actions of the alleged infringer, but also the market harm that would result from unrestricted and widespread conduct of the [same] sort." *Id.* (quotation marks omitted). The analysis "embraces both the primary market for the work and any derivative markets that exist or

that its author might reasonably license others to develop," *Warhol*, 11 F.4th 48; *Campbell*, 510 U.S. at 590 ("[t]he enquiry must take account not only of harm to the original but also of harm to the market for derivative works."), regardless of whether the "author claiming infringement has elected to develop such markets." *Warhol*, 11 F.4th at 49 (holding that the court must consider both "existing" and "potential" markets for an allegedly infringed work).

Hayden created and sold artworks and creative projects to various clients, including collectors and retail establishments, and he created and sold multiple creative works to Schicchi and Diva Futura. (Pl.'s 56.1 ¶ 101.) In fact, given that under Italian law Diva Futura was required to obtain a license to create derivative versions of the Hayden Work or to exploit the Hayden Work economically in Staller's shows and films, Diva Futura was *itself* a potential derivative licensing market for the Hayden Work.[4] (*Id.* ¶ 102.) What's more, as an individual who wished to make and exploit derivative works depicting actual or simulated sex acts with Staller atop the Hayden Work, Koon was *himself* also a reasonably-foreseeable potential licensing market for the Hayden Work. (*Id.* ¶ 103.) By using the Hayden Work without a license, Koons deprived Hayden of revenues to which he was entitled for this economic exploitation of his work. *See Fox News Network, LLC*, 883 F.3d at 180; *Ferdman v. CBS Interactive, Inc.*, 342 F. Supp. 3d 515, 541 (S.D.N.Y. 2018) ("Defendant's use is paradigmatic of the only market the photographs could reasonably have…"); *American Geophysical Union*, 60 F.3d at 929 ("It is indisputable that, as a general matter, a copyright holder is entitled to demand a royalty for licensing others to use its copyrighted work . .

---

[4] That Hayden did not actively seek to exploit his derivative licensing market is irrelevant to the fourth factor analysis. *See Castle Rock Entmn't. v. Carol Publish. Group*, 150 F.3d 132, 145-46 (2d Cir. 1998) ("Although Castle Rock has evidenced little if any interest in exploiting this market for derivative works . . . the copyright law must respect that creative and economic choice."); *Salinger v. Random House, Inc.*, 811 F.2d 90, 99 (2d Cir. 1987) ("the need to assess the effect on the market for Salinger's letters is not lessened by the fact that their author has disavowed any intention to publish them during his life-time.").

. and that the impact on potential licensing revenues is a proper subject for consideration in assessing the fourth factor"); *Campbell*, 510 U.S. at 593 ("the licensing of derivatives is an important economic incentive to the creation of originals"); *Warhol*, 11 F.4th at 50 ("if artists could use such images for free, there would be little or no reason to pay for [them]. . . . This, in turn, risks disincentivizing artists from producing new work by decreasing its value – the precise evil against which copyright law is designed to guard.") (quotation marks omitted); *Dr. Seuss Enters., L.P.*, 983 F.3d at 461 ("the unrestricted and widespread conduct of the sort engaged in by [the defendant] could create incentives to pirate intellectual property and disincentivize the creation of illustrated books.") (quotation marks omitted).[5]

Further, due to Koons' huge celebrity and his public appropriation of the Hayden Work, Hayden has lost the ability to claim uncontested authorship and copyright ownership of the Hayden Work. If Hayden were to attempt to exploit the Hayden Work in the future, he would be impeded from doing so because potential third party buyers and licensors are likely to believe Koons' claims of authorship and copyright ownership rather than Hayden's. (Pl.'s 56.1 ¶ 104.) This loss of association of an artist with his work is separately cognizable under the fourth factor. *See* Jane C. Ginsburg, *Fair Use Factor Four Revisited: Valuing the "Value of the Copyrighted Work."* JOURNAL OF THE COPYRIGHT SOCIETY OF THE U.S.A., VOL. 67, P. 19, 2020; COLUMBIA PUBLIC LAW RESEARCH PAPER NO. 14-653 (2020),[6] at *5 ("Non-attribution thus can 'sensibly diminish' the 'value' of the work to its author; equally significantly, the ensuing devaluation of authorship may

---

[5] Any argument that Koons' market does not overlap Hayden's has been firmly rejected by the Second Circuit. *See Warhol*, 11 F.4th at 48. (rejecting the lower court's "implicit rationale that the market for Warhol's works is the market for 'Warhols,' as doing so would permit this aspect of the fourth factor always to weigh in favor of the alleged infringer so long as he is sufficiently successful to have generated an active market for his own work.").

[6] Available at https://scholarship.law.columbia.edu/faculty_scholarship/2677/.

undermine copyright's role in fostering creativity.").

For all these reasons, the fourth factor also weighs against fair use.

**E.**    **Hayden's Claims Were Timely Filed**

Defendants' statute of limitations affirmative defense fails because Hayden filed this lawsuit within three years of his discovery of the existence of the Infringing Works in March 2019. *See Sohm v. Scholastic Inc.*, 959 F.3d 39, 50 (2d Cir. 2020) ("Civil actions for copyright infringement must be 'commenced within three years after the claim accrued' . . . . [A]n infringement claim does not 'accrue' until the copyright holder discovers, or with due diligence should have discovered, the infringement.") (quoting *Psihoyos v. John F. Wiley & Sons, Inc.*, 748 F.3d 120, 124 (2d Cir. 2014). Hayden's lack of knowledge concerning the existence of the Infringing Works prior to 2019 was not unreasonable under the circumstances. (Pl.'s 56.1 ¶¶ 56-60.)

**CONCLUSION**

For all the reasons discussed above, the Court should grant Plaintiff's motion for summary judgment in its entirety.

Dated:  New York, New York
        September 15, 2022

**FLETCHER LAW, PLLC**

By: _____
    Jordan Fletcher
    246 Fifth Avenue, 3rd Floor
    New York, NY 10001
    jordan@fletcherlaw.co
    (212) 320-8945
    *Counsel for Plaintiff Michael A. Hayden*

**OWEN, WICKERSHAM & ERICKSON, P.C.**

/s/ Linda Kattwinkel

_____

Linda Joy Kattwinkel (admitted *pro hac vice*)
One Concord Center
2300 Clayton Road, Suite 1400
Concord, CA 94520
ljk@owe.com
(415) 882-3200
*Counsel for Plaintiff Michael A. Hayden*