UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

| | | |
|---|---|---|
| MICHAEL A. HAYDEN, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 1:21-cv-10249 (LGS) |
| | : | |
| -against- | : | **DEFENDANTS' RESPONSE TO** |
| | : | **PLAINTIFF'S RULE 56.1** |
| JEFF KOONS and JEFF KOONS LLC, | : | **STATEMENT AND COUNTER-** |
| | : | **STATEMENT PURSUANT TO** |
| Defendants. | : | **RULE 56.1** |

--------------------------------------------------------x

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1, Defendants Jeff Koons and Jeff Koons

LLC hereby respond to Plaintiff's Statement of Material Facts, as to which Plaintiff contends there

are no genuine issues of material fact to be tried.  Defendants also hereby submit their own

Counter-Statement of Undisputed Material Facts, in support of their cross-motion for summary

judgment dismissing the Complaint.

**Objection to Plaintiff's Rule 56.1 Statement**

The Rule 56.1 Statement is required to be "short and concise."  Plaintiff's statement,

numbering 111 paragraphs and 29 pages, is not short or concise.  It also contains statements that

do not pertain to material (or even relevant) facts, but instead are immaterial, contentious, and

sometimes involve opinions about legal issues that do not belong in this document.  Subject to

those objections, Defendants submit this paragraph-by-paragraph Response.

## RESPONSE TO PLAINTIFF'S RULE 56.1 STATEMENT

**Procedural History**

1.    Plaintiff Michael A. Hayden filed a Complaint on December 2, 2021. (ECF 1).

**Response:**  Not disputed.

2.    On July 18, 2022, the Court denied Defendant Jeff Koons' motion to dismiss the

Complaint. (ECF 38).

**Response**:  The motion to dismiss was denied, with a request that certain of the issues be briefed again at the summary judgment stage, and the motion to limit damages to a three-year lookback period was granted.  *Id*.

3.      Mr. Hayden filed a First Amended Complaint on July 28, 2022, adding Jeff Koons LLC as a defendant. (ECF 44).

**Response:**  Not disputed.

4.      Defendants filed an Answer to First Amended Complaint on August 11, 2022. (ECF 50).

**Response:**  Not disputed.

**<u>Plaintiff Michael A. Hayden</u>**

5.      Mr. Hayden is a United States citizen who was born in San Francisco, California. From 1980 until 2007, Mr. Hayden resided primarily in Italy, in or near the city of Rome. For short periods in approximately 1981 and 1987, Mr. Hayden returned to live in San Francisco. Declaration of Michael A. Hayden dated September 13, 2022 ("<u>Hayden Decl.</u>") ¶¶ 1-2.

**Response:**  Not disputed.

6.      From approximately 2007 until July 2022, Mr. Hayden resided primarily in Nicaragua. Hayden Decl. ¶ 3.

**Response:**  Not disputed.

7.      In July 2022, Mr. Hayden returned to Rome, and he currently resides in Italy. Mr. Hayden has periodically maintained a mailing address in California. Hayden Decl. ¶ 4.

**Response:**  Not disputed.

8.      During the time that he lived in Italy, *i.e.*, approximately 1980 until 2007, Mr.

Hayden worked, variously, as a set and prop designer for live theater companies and as a self-employed visual artist. He also worked in the fields of interior design and residential architecture, construction, and remodeling. Hayden Decl. ¶ 5.

**Response:** Not disputed.

9.    During the period of time that he lived in Nicaragua, Mr. Hayden earned money primarily through residential architecture design, construction oversight, and remodeling; property leasing and management; and owning a restaurant. Hayden Decl. ¶ 6.

**Response:** Not disputed.

10.    From the early 1980s through the present, Mr. Hayden has been an artist and has created works of art in various forms. Mr. Hayden has created paintings, sculptures, artistic interior installations, interior designs, and architectural designs. Mr. Hayden has sold numerous paintings, artworks, and art installations to private collectors and commercial retail establishments. Mr. Hayden's artwork has been exhibited publicly in the United States and Nicaragua, at art fairs, in galleries, and at an art school. Hayden Decl. ¶ 7.

**Response:** It is not clear what Plaintiff means when he says he has sold "numerous" art works. What is undisputed is that Plaintiff has never registered a copyright for any of those works (Declaration of Daniel J. Brooks dated October 5, 2022 ("Brooks Dec."), Ex. A-1 (Hayden Depo.), at 42-43), with the single exception of the Hayden Work, which was created in 1988 and not registered until 2019, and, then, only so that Plaintiff could bring this lawsuit (*id*. at 192). It is also undisputed that Plaintiff has never been represented by a gallery, that the exhibitions of his work in galleries occurred 25 years ago and were not "shows," and that Plaintiff's work has never been exhibited in and is not part of a collection in any museum. *Id*. at 11-14. From this, it

can be inferred that Plaintiff's true output and sales of his art have been negligible and that he

has not supported himself financially as an "artist."

**The Hayden Work**

11.    In or about the late 1980s, Mr. Hayden created several sculptural projects for the

Italian company Diva Futura, which was owned by Ilona Staller and Ricardo Schicchi. Hayden

Decl. ¶ 8; Declaration of Jordan Fletcher dated September 15, 2022 ("Fletcher Decl.") Exh. H-2

(Koons Tr. at 77).

**Response:**  Not disputed.

12.    Ms. Staller was a famous Hungarian-born Italian adult erotic performer, who

performed in live theatre shows and films under the stage name, "Cicciolina." In or about the late

1980s, she was also elected and served as a member of the Italian parliament. Hayden Decl. ¶ 8;

Fletcher Decl. Exh. H-1 (Koons Tr. at 41-42, 46-50).

**Response:**  Not disputed.

13.    In addition to being an owner of Diva Futura, Mr. Schicchi was also Ms. Staller's

manager, director, and a photographer of much of her erotic work. Hayden Decl. ¶ 8; Fletcher

Decl. Exh. H-2 (Koons Tr. at 77-78).

**Response:**  Not disputed.

14.    Diva Futura was the production company though which Ms. Staller engaged in

live, photographic, cinematic, and related adult-oriented performances. Hayden Decl. ¶ 8.

**Response:**  Not disputed.

15.    Mr. Hayden created several sculptural works for Diva Futura which were used in

connection with Ms. Staller's live erotic performances. These included a series of cats, a lizard, a

pyramid, a wall fresco, a starfish and seaweed, and a variety of boulders. Mr. Hayden was paid in

cash for these works by Mr. Schicchi. Hayden Decl. ¶ 9.

**Response:**  Not disputed.

16.     In the course of his work for Diva Futura, Mr. Hayden came to understand that Ms. Staller was fond of snakes. He knew that she had a pet boa constrictor, which she incorporated into her live erotic shows from time to time. Hayden Decl. ¶ 10.

**Response:**  Not disputed.

17.     In 1988, Mr. Hayden created a large, original, three-dimensional sculptural work depicting a giant serpent wrapped around a pedestal of boulders (the "Hayden Work"). He created the Hayden Work entirely by himself, over the course of several weeks, in a storeroom in the basement of the building in which he lived in Rome. Hayden Decl. ¶ 11; Declaration of Sergio Meschino dated June 8, 2022 ("Meschino Decl.") ¶ 4.

**Response:**  Not disputed.

18.     The Hayden Work was fabricated out of Styrofoam, which Mr. Hayden molded and shaped using a knife, metal brushes, and sandpaper. Mr. Hayden then applied glue, gauze, and plaster, and then paint of various colors, including a base of blues, greens, and brown, along with gold and copper highlights. The overall dimensions of the Hayden Work are, to the best of Mr. Hayden's recollection, approximately two meters (6.56 feet) long, by one meter (3.28 feet) wide, by 60 centimeters (1.96 feet) tall. Hayden Decl. ¶ 12.

**Response:**  Not disputed, with the following amplification: While Plaintiff may have mixed various colors together, the visual effect, as seen in the images referenced in paragraph 19, is monochromatic and somber.  *See* the images contained in ¶ 19.

19.     Images of the Hayden Work are below:

**Response:**  It is undisputed that these are images of the Hayden Work.

(continued)









Hayden Decl. Exh. A.

20.    After finishing the Hayden Work, Mr. Hayden approached Mr. Schicchi to inquire whether Diva Futura might purchase the Hayden Work for use as a platform upon which Ms. Staller could perform her live erotic shows and film work. Mr. Schicchi agreed, and Diva Futura paid Mr. Hayden $900 cash (in United States currency) in exchange for the sculpture. Mr. Hayden may have signed a simple receipt acknowledging the transaction. No formal contract between Mr. Hayden and Diva Futura was ever created or signed concerning the Hayden Work or the copyright or exploitation rights to the Hayden Work. Mr. Hayden did not intend that the Hayden Work would be used by anyone other than Diva Futura. Mr. Hayden did not give written or verbal permission for Diva Futura to authorize third parties to use, reproduce, create derivatives of the Hayden Work. Hayden Decl. ¶¶ 13-14.

**Response:**  Undisputed, but requires the following context to make the statement complete: Even before approaching Schicchi, Plaintiff created the Hayden Work with Cicciolina "in mind," giving it a flat top and making it low enough to be "easy to step onto" so that it could fulfill its intended purpose of serving as a platform on which Cicciolina could perform erotic acts both on film and before live audiences, who would be charged admission.  Brooks Dec., Ex. A-2, at 56, 60, 66, 74; Complaint, ¶ 5.  If Diva Futura had not purchased the Hayden Work, Plaintiff had no other potential purchaser in mind.  Brooks Dec., Ex. A-2, at 68-69.  Plaintiff understood and intended that the Hayden Work "would be used commercially by . . . Cicciolina, Diva Futura and Mr. Schicchi."  Complaint, ¶ 30; Brooks Dec., Ex. A-2, at 77-78.

21.    The Hayden Work was the last project that Mr. Hayden ever created for Diva Futura, Ms. Staller, or Mr. Schicchi. After the sale of the sculpture, Mr. Hayden had no further contact with Ms. Staller or Mr. Schicchi. Hayden Decl. ¶ 15.

**Response:**  Not disputed.

## Copyright Status of the Hayden Work Under Italian Law

22.    Mr. Hayden understands that, under Italian law, he did not need to register the copyrights in his artworks, and that Italian law does not provide a "fair use" exception to copyright infringement. Hayden Decl. ¶ 16.

**Response:**  Plaintiff's understanding of Italian law is neither material nor relevant.  As to the actual substance of Italian law, *see* responses to paragraphs 23-26.

23.    Italian law applied to the terms of sale of the Hayden Work from Mr. Hayden to Diva Futura. Expert Report of Dr. Marco Ricolfi ("Ricolfi Report") ¶ 9(i).

**Response:**  Pursuant to Fed. R. Civ. P. 44.1, determinations of foreign law are treated as questions of law and not questions of fact. *Animal Science Products, Inc. v. Hebei Welcome*

*Pharmaceutical Co. Ltd.*, ___ U.S. ___, 138 S. Ct. 1865, 1873 (2018).  Accordingly, statements about the substance of foreign law do not belong in a Rule 56.1 Statement of undisputed material facts and no response to this paragraph is required.

24.    In the absence of written documents proving a transfer of specific rights, none of the exclusive rights conferred under Italian copyright law to Mr. Hayden were transferred to Diva Futura in connection with the transaction. Ricolfi Report ¶ 9(ii).

**Response:**  Pursuant to Fed. R. Civ. P. 44.1, determinations of foreign law are treated as questions of law and not questions of fact. *Animal Science Products, Inc. v. Hebei Welcome Pharmaceutical Co. Ltd.*, ___ U.S. ___, 138 S. Ct. 1865, 1873 (2018).  Accordingly, statements about the substance of foreign law do not belong in a Rule 56.1 Statement of undisputed material facts and no response to this paragraph is required.

25.    These exclusive rights granted to Mr. Hayden under Italian copyright law as the creator of the Hayden Work included: the right to make reproductions, the right to perform, the right to communicate to the public (including digital distribution), the right to make derivative works, the right to rent and to loan, and the right to all other forms of economic exploitation. Ricolfi Report ¶ (9)(ii)(v).

**Response:**  Pursuant to Fed. R. Civ. P. 44.1, determinations of foreign law are treated as questions of law and not questions of fact. *Animal Science Products, Inc. v. Hebei Welcome Pharmaceutical Co. Ltd.*, ___ U.S. ___, 138 S. Ct. 1865, 1873 (2018).  Accordingly, statements about the substance of foreign law do not belong in a Rule 56.1 Statement of undisputed material facts and no response to this paragraph is required.

26.    At most, according to one Italian court, Diva Futura *may* have implicitly gained the authority to exhibit the Hayden Work publicly. And, according to one Italian commentator

(though never any Court), Diva Futura *may* have implicitly gained the authority to create a

"thumb-nail" or other straightforward visual copy of the Hayden Work *solely to facilitate a*

*subsequent sale of the physical object* of the Hayden Work. However, under Italian law, these

permissions – if they did exist – would have been unrelated to any of the exclusive rights of an

author under copyright; rather, they would have arisen from the separate "bundle" of rights

belonging to the owner of a physical entity. Ricolfi Report ¶ (9)(ii)(viii), (ix), (x), (xi), (xiii) and

(xiv)

**Response:**  Pursuant to Fed. R. Civ. P. 44.1, determinations of foreign law are treated as

questions of law and not questions of fact. *Animal Science Products, Inc. v. Hebei Welcome*

*Pharmaceutical Co. Ltd.*, ___ U.S. ___, 138 S. Ct. 1865, 1873 (2018).  Accordingly, statements

about the substance of foreign law do not belong in a Rule 56.1 Statement of undisputed material

facts and no response to this paragraph is required.


27.     Diva Futura did not acquire any right, via its transaction with Mr. Hayden, to

make derivative works of the Hayden Work. Nor was any third party permitted to make

derivative works of the Hayden Work, either on their own initiative or on the basis of any

purported authority given by Diva Futura. Ricolfi Report ¶¶ 9(iii) and (iv).

**Response:**   Pursuant to Fed. R. Civ. P. 44.1, determinations of foreign law are treated as

questions of law and not questions of fact. *Animal Science Products, Inc. v. Hebei Welcome*

*Pharmaceutical Co. Ltd.*, ___ U.S. ___, 138 S. Ct. 1865, 1873 (2018).  Accordingly, statements

about the substance of foreign law do not belong in a Rule 56.1 Statement of undisputed material

facts and no response to this paragraph is required.

**Mr. Koons and the Infringing Works**

28.     Defendant Jeff Koons ("<u>Koons</u>") is an individual who resides in New York and

conducts significant business in New York. Mr. Koons has admitted to personal jurisdiction in

this Court. Answer to First Amended Complaint ("Answ.") (ECF 50) ¶ 18; Fletcher Decl. Exh.

H-1 (Koons Tr. at 16-17).

**Response:**  Not disputed.

29.     Defendant Jeff Koons LLC (together Koons, "Defendants") is a Delaware entity

registered as a foreign limited liability company with the New York Secretary of State. Jeff

Koons LLC is wholly-owned and managed by Mr. Koons. Jeff Koons LLC has admitted to

personal jurisdiction in this Court. Answ. (ECF 50) ¶ 18; Fletcher Decl. Exh. H-1 (Koons Tr. at

21-23).

**Response:**  Not disputed.

30.     Mr. Koons is one of the most controversial living artists in the world. Mr. Koons

is known widely as an "appropriation artist." As described by United States District Judge Louis

L. Stanton in his 2007 opinion in *Blanch v. Koons*, a lawsuit for copyright infringement against

Mr. Koons, "[a]ppropriation artists take other artists' work and use it in their own art,

appropriating and incorporating it in their own product with or without changes. Because of this

appropriation, often . . . done without giving credit to the original artist, the appropriation artists

can expect that their work may attract lawsuits." *Blanch v. Koons*, 485 F. Supp. 2d 516, 518

(S.D.N.Y. 2007).

**Response:**  Judge Stanton's opinion speaks for itself, and no response is required, except to state

that Judge Stanton granted summary judgment in favor of the defendants on the grounds that Mr.

Koons made fair use of the plaintiff's copyrighted image, as affirmed by the Second Circuit.

*Blanch v. Koons*, 467 F.3d 244, 249 (2d Cir. 2006).

31.     In 1989 and 1990, Mr. Koons hired Ms. Staller and traveled to Italy multiple

times to be photographed with Ms. Staller in sexually explicit positions, in preparation for two

upcoming Koons exhibitions and a new series of works, which would be called *Made in Heaven*.

In accordance with Mr. Koons' specific request, the photo sessions occurred on Ms. Staller's

own sets at Mr. Schicchi's studio and incorporated a variety of the theatrical backdrops, props,

and costumes that Ms. Staller had used previously in her other erotic work. Fletcher Decl. Exh.

H-1 and H-2 (Koons Tr. at 45-46, 79-85, 94) and Exh. C (JK00306, JK00362-63).

**Response:** Not disputed.

32.     The Hayden Work, or portions of thereof, was used by Mr. Koons and Ms. Staller

during the photo sessions. The Hayden Work was depicted in certain photographs taken by Mr.

Schicchi and provided to Mr. Koons. Fletcher Decl. Exh. H-2 (Koons Tr. at 113-16).

**Response:** Not disputed.

33.     Mr. Koons subsequently incorporated depictions and/or derivative versions of the

Hayden Work, in whole or in part, in at least six different artworks that came to be part of his

*Made in Heaven* series. These six works were entitled *Made in Heaven*, *Jeff and Ilona (Made in

Heaven)*, *Jeff in the Position of Adam*, *Fingers between Legs*, *Ilona with Ass Up*, and *Silver

Shoes*. The Hayden Work was also reproduced by Mr. Koons onto tote bags. Fletcher Decl. Exh.

H-3 (Koons Tr. at 138-39).

**Response:** Defendants dispute that any of the *Made in Heaven* works were derivative versions

of the Hayden Work, and dispute that the cited testimony states that any of the works were

"derivative" or that the Hayden Work was reproduced onto tote bags.

34.     Three of the works in which Mr. Koons incorporated derivative versions of the

Hayden Work are the subject of this lawsuit. They are *Made in Heaven*, *Jeff and Ilona (Made in

Heaven)*, and *Jeff in the Position of Adam* (altogether the "Infringing Works"). Amended

Complaint (ECF 44) ¶ 36.

**Response:** Defendants do not dispute that the three works are the subject of this lawsuit, but dispute that the works are "derivative" versions of the Hayden Work and dispute that the Amended Complaint refers to the works as being "derivative."

35.   Mr. Koons had his lawyers draft at least one written contract to memorialize the terms of agreement between Mr. Koons and Diva Futura. Under the terms of that contract, Mr. Koons received the negatives to twenty photographs shot by Mr. Schicchi. Although the contract granted Mr. Koons ownership rights to the photographs and their negatives, it did not specifically purport to grant Mr. Koons the rights to use, display, reproduce, or create derivative works based upon any third party-owned materials that might be depicted in those photographs. Fletcher Decl. Exh. H-2 and H-3 (Koons Tr. at 91-97, 164-65) and Exh. C (JK00362-64).

**Response:** Defendants dispute this paragraph inasmuch as the contract (Fletcher Dec., Ex. C, at JK00362-00364, ¶¶ 4, 5) gave Koons exclusive ownership of all rights, including copyright, in the photographs and the right "to utilize these photographs as his exclusive property in any manner or form as he chooses."

36.   At no time did Mr. Koons seek or obtain verbal or written authorization from Mr. Hayden to reproduce or display the Hayden Work, distribute copies of the Hayden Work to the public, or prepare derivative works based upon the Hayden Work. At no time did Mr. Koons ask Mr. Schicchi who had created the Hayden Work. Fletcher Decl. Exh. A (RFA Response No. 2), Exh. H-3 (Koons Tr. at 164-65).

**Response:** It is undisputed that Mr. Koons did not seek or obtain authorization from Mr. Hayden and did not ask Mr. Schicchi who had created the Hayden Work, but it is also undisputed that Mr. Hayden never asked Diva Futura to credit him if his platform was used in

one of Cicciolina's porn films or live performances (Brooks Dec., Ex. A-2, at 78) and it is undisputed that Mr. Koons requested that Staller and Diva Futura tell him who should be credited, that Mr. Koons would have credited anyone that Diva Futura wished to have credited, that Mr. Schicchi was, in fact, credited as the photographer for the *Made in Heaven* billboard, and that Mr. Schicchi was the only one that Diva Futura asked to be credited.  Fletcher Dec., Ex. C, at JK00307, JK00364, ¶ 10; Ex. H-2, at 89, 97; Ex. H-3, at 141, 165, 168.

*Made in Heaven* Billboard (1989)

37.     The Infringing Work *Made in Heaven* is a lithograph billboard ("*Made in Heaven* Billboard") created in 1989. It measures approximately 10 feet by 22.67 feet and was created as an edition of 3 plus one artist's proof. Fletcher Decl. Exh. B (JK00001). These are images of the *Made in Heaven* Billboard:

**Response:**  Defendants dispute that the billboard is an "Infringing Work," but do not dispute that the images depict the billboard or the balance of the paragraph.





Fletcher Decl. Exh. B (JK00400-01).

38.     Lithography is a printing technique. To create the *Made in Heaven* Billboard, Mr. Koons hired an outside company to make separations of the colors featured in an original photograph taken by Mr. Schicchi. The company then printed those colors onto large format paper, which was then mounted using glue to a billboard frame on top of a building in lower Manhattan, New York City. Fletcher Decl. Exh. H-2 (Koons Tr. at 120-24).

**Response:**  Not disputed.

39.     The first public display of the *Made in Heaven* Billboard was part of an exhibition put on by the Whitney Museum of American Art (the "Whitney") in late 1989 called *"Image World."* However, after the "Image World*"* exhibition closed, Mr. Koons had the *Made in Heaven* Billboard image reprinted onto new paper, which was then mounted onto canvases for display in museums and ultimately for sale to collectors. Fletcher Decl. Exh. H-2 (Koons Tr. at 119-24).

**Response:**  Not disputed.

40.    The *Made in Heaven* Billboard was exhibited numerous times, in museums around in Europe and the United States, between 1989 and 2015. Its three editions were sold by Mr. Koons and are currently owned by private collectors and a museum. Mr. Koons destroyed the Artist's Proof prior to this litigation. Fletcher Decl. Exh. B (JK00001-02) and Exh. H-2 (Koons Tr. at 125).

**Response:**  Not disputed, but it should be noted that the three editions were sold approximately 30 years ago, in 1991 and 1993.  Fletcher Dec., Ex. D, at JK00078, JK00131.

*Jeff and Ilona (Made in Heaven)* (1990)

41.    The Infringing Work *Jeff and Ilona* (*Made in Heaven)* is a "polychromed" wood sculptural work created in 1990. It measures 5.5 feet by 9.5 feet by 5.4 feet and was created as an edition of 1 plus an artist's proof. Fletcher Decl. Exh. B (JK00011). These are images image of *Jeff and Ilona (Made in Heaven)*:

**Response:**  Defendants dispute that this work is an "Infringing Work" and assert that the artist's proof was destroyed (Fletcher Dec., Ex. H-2, at 126), but do not dispute the balance of the paragraph or that the images depict the work, but note that the image propped up against the wall behind *Jeff and Ilona* is *Silver Shoes*.





Fletcher Decl. Exh B (JK00397-98).

42.     "Polychromed" wood simply means painted wood. To create *Jeff and Ilona (Made in Heaven)*, Mr. Koons created drawings based on the original photographs taken by Mr. Schicchi and then hired an outside company to render the drawings three-dimensionally into a clay model. The clay model was then reproduced into wood by an outside company. Finally, the wood sculpture was painted with a variety of colors, including gold, orange, green, and turquoise by hired artisans. Fletcher Decl. Exh. H-2 and H-3 (Koons Tr. at 132-33, 137-38, 151).

**Response:**  Dispute that "polychromed" wood simply means painted wood; as the images above reflect, "polychromed" wood is painted in a variety of colors.  As the images above reflect, the wood sculpture was also painted red (Cicciolina's lipstick and the snake's tongue) in addition to the colors listed in the paragraph.

43.     *Jeff and Ilona (Made in Heaven)* premiered at the Venice Biennale in 1990 and has been exhibited several times since then. Mr. Koons sold the only edition, which is currently owned by the Ludwig Museum in Cologne, Germany. Mr. Koons destroyed the Artist's Proof prior to this litigation. *Jeff and Ilona (Made in Heaven)* has been exhibited publicly since 2020 at the Ludwig Forum in Aachen, Germany. Fletcher Decl. Exh. B (JK00011-12) and Exh. H-3 (Koons Tr. at 159).

**Response:**  Not disputed.

*Jeff in the Position of Adam* (1990)

44.     The Infringing Work *Jeff in the Position of Adam* is a work of oil inks on canvas created in 1990. It measures 8 feet by 12 feet and was created as an edition of 1 plus an artist's proof. Fletcher Decl. Exh. B (JK00018). This is an image of *Jeff in the Position of Adam*:

**Response:** Defendants dispute that the work is an "Infringing Work" and note that the artist's proof was destroyed (Fletcher Dec., Ex. H-2, at 126), but do not dispute the balance of the paragraph or that the image depicts the work.



Fletcher Decl. Exh. B (JK00399).

45.     To create *Jeff in the Position of Adam*, Mr. Koons started with Mr. Schicchi's photograph and then had the image reproduced onto canvas using a printing process similar to an ink jet machine. Fletcher Decl. Exh. H-2 (Koons Tr. at 134).

**Response:** Not disputed.

46.     The single edition of *Jeff in the Position of Adam* was sold by Mr. Koons to a private collector, and Mr. Koons previously destroyed the artist's proof. *Jeff in the Position of*

*Adam* has been exhibited publicly on numerous occasions. In 2019, Mr. Koons and Jeff Koons

LLC actively participated in and assisted with a museum exhibition by the Museo Jumex in

Mexico City, which ran from May to September 2019 and featured *Jeff in the Position of Adam.*

Fletcher Decl. Exh. B (JK00018-19) and Exh. H-2 and H-3 (Koons Tr. at 126, 157-58).

**Response:**  Defendants dispute that they actively participated in the exhibition in Mexico City;

Mr. Koons merely cooperated by discussing with the curator which of his works "would be nice"

and which ones "I'd prefer not to be there," and received no payment.  Fletcher Dec., Ex. H-3, at

158.

**Website Use by Defendants**

47.     Images of the Infringing Works have been publicly displayed on the website

www.jeffkoons.com ("Koons Website") continuously for at least several years, including during

the three-year period immediately prior to the filing of this lawsuit. The Koons Website is owned

by defendant Jeff Koons LLC. Fletcher Decl. Exh. A (RFA Response No. 3) and Exh. H-4

(Koons Tr. at 225).

**Response:**  Not disputed.

48.     Images of the Infringing Works were publicly displayed on the Koons Website as

of April 2020, when counsel for Mr. Hayden sent a cease-and-desist letter to Mr. Koons; they

were displayed on the Koons Website on the day this lawsuit was filed in December 2021; and

they are currently displayed on the Koons Website. Fletcher Decl. ¶ 11, Exh. A (RFA Response

No. 9), Exh. F; Complaint (ECF 1).

**Response:**  Defendants dispute that the *Made in Heaven* artworks are "Infringing Works" and

dispute that the letter (Fletcher Dec., Ex. F) is a "cease-and-desist letter" since the letter nowhere

employs the word "cease" or the word "desist" and, rather than demanding that Mr. Koons

terminate any activities or conduct, it merely seeks an "amicable resolution"; i.e., it only seeks to extract a monetary settlement.  Defendants also dispute that Plaintiff's citations to evidence support the allegations in this paragraph.

49.    The website displays of images of the Infringing Works by Jeff Koons LLC and Mr. Koons are and have been accompanied by copyright icons indicating that copyrights in and to the Infringing Works are owned by Mr. Koons. Fletcher Decl. Exh. A (RFA Response No. 5), Exh. E, Exh. H-4 (Koons Tr. 222-23).

**Response:**  Not disputed, except as to the term "Infringing Works."

50.    The Koons Website's displays of images of the Infringing Works by Jeff Koons LLC and Mr. Koons are and have been accompanied by text and context indicating that Mr. Koons is the author of the Infringing Works. These include: (a) the name "JEFF KOONS" appears in large font at the top of the webpages on which each of the Infringing Works are displayed, immediately above the images of the Infringing Works; (b) the web address and landing page of the Koons Website contain Mr. Koons' full name; (c) the Koons Website is comprised of various artworks by and biographical information about Mr. Koons; (d) no other artists' artworks are displayed on the Koons Website. Fletcher Decl. Exh. E.

**Response:**  Not disputed, except as to the term "Infringing Works."

51.    The Koons Website does not and has never identified Mr. Hayden as the author or copyright owner of the Infringing Works or the portions of those works that contain depictions of the Hayden Work. Fletcher Decl. Exh. A (RFA Response Nos. 7), Exh. H-4 (Koons Tr. at 223).

**Response:**  Not disputed, except as to the term "Infringing Works."

**<u>Visual Artists Rights Act Violations</u>**

52.    Mr. Hayden created the Hayden Work as a three-dimensional, sculptural work of

fine art. Hayden Decl. ¶ 11.

**Response:** Defendants dispute that the Hayden Work, which has a functional purpose, qualifies as "fine art," or that the cited paragraph in the Hayden Declaration supports that contention.

53. The Infringing Works are all works of fine art. Although the *Made in Heaven* Billboard was created to look like an advertisement for a film starring Mr. Koons and Ms. Staller, in reality no such film ever existed. Although Mr. Koons once had an idea that he might possibly make a film, he never committed to making the film, never hired any production staff, never signed agreements with actors, and is not aware that any contracts were ever signed concerning Ms. Staller's or Diva Futura's participation in such a film. Fletcher Decl. Exh. H-2 (Koons Tr. at 104-07).

**Response:** Not disputed, excepted as to the term "Infringing Works."

54. Mr. Koons has communicated to the public, or caused the public to understand, that he is the author of the Infringing Works. Fletcher Decl. Exh. H-3 (Koons Tr. at 162-63).

**Response:** Defendants dispute that the cited pages of the Koons transcript support this contention.

55. Mr. Koons has never identified Mr. Hayden as an "author" in connection with the public display of the Infringing Works, and Mr. Koons believes that it is not possible that Mr. Hayden has ever been identified by anyone else as an "author" in connection with public displays of the Infringing Works. Fletcher Decl. Exh. A (RFA Response No. 11), Exh H-3 (Koons Tr. at 171-72).

**Response:** Not disputed, except as to the term "Infringing Works."

**Mr. Hayden's Discovery of the Infringing Works**

56. Mr. Hayden did not become aware of Mr. Koons' creation of the Infringing

Works until April 2019. Hayden Decl. ¶ 17.

**Response:**  Defendants cannot get into Mr. Hayden's mind and are unable, therefore, to dispute

his claim that, despite the passage of thirty years and the highly publicized nature of the Koons

artworks, he did not actually become aware of Mr. Koons's *Made in Heaven* works until April

2019, but assert that, in the exercise of due diligence, Mr. Hayden should have discovered the

existence of these works decades before that.  Mr. Hayden was residing in Rome when the

Koons works premiered in Venice in 1990, causing a "media sensation and scandal" (Complaint,

¶ 10), and when, a few years later, another scandal erupted over the divorce and child custody

battle being waged in an Italian court between Mr. Koons and Cicciolina.  Mr. Hayden, who

resided in Italy until 2007 and consumed Italian newspapers and television news (Brooks Dec.,

Ex. A-1, at 18, 31-34), became aware of the sensational lawsuit between Mr. Koons and

Cicciolina because it was "in all the newspapers" and on television.  *Id*. Ex. A-2, at 110-12.  The

surrounding publicity – which inevitably must have mentioned the couple's then-recent

controversial artistic collaboration – put Mr. Hayden on inquiry notice of Mr. Koons's alleged

copyright infringement of the Hayden Work.  Instead, Mr. Hayden stuck his head in the sand,

just as he did when he allegedly failed to discover (Complaint, ¶ 59) that Cicciolina was

modeling a line of clothing, the *Cicciolina Collection*, in her Rome studio in 1989 in which she

was depicted seated on the Hayden Work.  Brooks Dec., ¶ 11.

57.     Mr. Hayden discovered the existence of the Infringing Works when his then-

business partner, Sergio Meschino, alerted him to a news article, dated April 30, 2019 and

published in the online version of an Italian daily news publication called *La Repubblica*. The

article discussed a legal dispute between Ms. Staller and Sotheby's auction house and displayed

an image of the *Made in Heaven* Billboard. Hayden Decl. ¶ 18 and Exh. C; Meschino Decl. ¶¶ 7

and 9.

**Response:**  Not disputed, subject to the evidence set forth in the Response to paragraph 56.

58.     Prior to this discovery, Mr. Hayden had no knowledge of any of Mr. Koons'

artworks, nor had he communicated with Ms. Staller or Mr. Schicchi since approximately 1988.

Hayden Decl. ¶ 19.

**Response:**  Not disputed, subject to the evidence set forth in the Response to paragraph 56.

59.     Although Mr. Hayden knows Ms. Staller to be a celebrity and household name in

Italy, he does not believe that many Italians during the period he lived in Italy, *i.e.*, 1990 to 2007,

knew about Mr. Koons or his artwork. Hayden Decl. ¶ 19.

**Response:**  Not disputed as to Mr. Hayden's knowledge.

60.     Mr. Meschino, who is an Italian citizen and Mr. Hayden's former business partner

and former romantic partner, also was not aware of the existence of the Infringing Works prior to

his discovery of the *La Repubblica* article in 2019. Prior to seeing that article, Mr. Meschino

does not believe that he had ever heard of Mr. Koons. Mr. Meschino does not believe that many

"regular" Italian people have heard of Mr. Koons or are very familiar with his artwork. Meschino

Decl. ¶¶ 1,3, 8.

**Response:**  Mr. Meschino's opinions about what many "regular" Italian people know is not

admissible evidence.

**Defendants Continued to Infringe Willfully After Being Contacted by Mr. Hayden**

61.     In late March 2020, counsel for Mr. Hayden sent a cease-and-desist letter to counsel

for Mr. Koons, informing Mr. Koons about the infringing conduct alleged in this lawsuit, including

alleged violations of the U.S. Copyright Act, 17 U.S.C. § 501, *et seq*.; the Digital Millennium

Copyright Act's false copyright management provisions, 17 U.S.C. § 1202(a); and the Visual

Artist's Rights Act, 17 U.S.C. § 106A. Fletcher Decl. ¶ 7 and Exh. F.

**Response:** For the reasons set forth in the Response to paragraph 48, Defendants dispute that the March 30, 2020 letter (Fletcher Dec., Ex. F) is a "cease-and-desist" letter.

62.    In or about late March or early April 2020, Mr. Koons became aware of Mr. Hayden's allegations raised in this lawsuit. Fletcher Decl. Exh. A (RFA Response No. 8) and Exh. H-4 (Koons Tr. at 224).

**Response:** Not disputed.

63.    After Mr. Koons became aware of Mr. Hayden's allegations raised in this lawsuit, the depictions of the Infringing Works on the Koons Website did not change; the Koons Website continued to identify Mr. Koons as the copyright owner and author of the Infringing Works. Fletcher Decl. Exh. A (RFA Response No. 9) and Exh. H-4 (Koons Tr. at 223-24).

**Response:** Not disputed, except as to the term "Infringing Works."

64.    At no time since he first learned about Mr. Hayden's allegations did Mr. Koons instruct the manager of Jeff Koons LLC that the depictions of the Infringing Works on the Koons Website should be changed or taken down. Fletcher Decl. Exh. H-4 (Koons Tr. at 223-24).

**Response:** Not disputed, except as to the term "Infringing Works."

65.    Mr. Koons has the authority to direct that images be removed from the Koons Website, and he has, in the past, directed certain images to not be displayed when he believed were inappropriate for public display. Fletcher Decl. Exh. H-4 (Koons Tr. at 226-28).

**Response:** Not disputed.

## Material Facts Relating to the Absence of Fair Use

First Factor, Part One: Non-Transformative Use

66.    The *Made in Heaven* Billboard closely reproduces the colors, highlights, shadows, form, curvature, undulations, surface features, and surface markings of the Hayden Work's serpent and boulder. *Compare* Hayden Decl. Exh. A *with* Fletcher Decl. Exh. B (JK00001, JK00400-01).

**Response:**   This is disputed, as even a cursory comparison of the respective works discloses.  In addition to what can be seen by the naked eye, Hayden admitted that the Billboard had colors that were more "golden," "vivid," "dynamic," and less "somber" than those in the Hayden Work and that the boulders and snake were more "glistening" in the Billboard than in the Hayden Work.  Brooks Dec., Ex. A-3, at 135-36.  Hayden also admitted that the bodies of Koons and Staller obscured the rocks from the Hayden Work, which are not visible in the Billboard.  *Id*. at 120.

67.    In creating the *Made in Heaven* Billboard based on photographs taken by Mr. Schicchi, Mr. Koons did not intentionally change the form, color, shape, surface markings, or shading of the Hayden Work's serpent and boulder. Fletcher Decl. Exh. H-2 (Koons Tr. at 143-47)

**Response:**  This is disputed.  Koons testified that the colors were "corrected" and "adjusted." Fletcher Dec., Ex. H-3, at 143, 144, 149.  And Hayden testified that the boulders were obscured. Brooks Dec., Ex. A-3, at 120.

68.    Mr. Koons testified that, in creating the *Made in Heaven* Billboard, he may have cropped the original photographic image, engaged in light photoshop retouching to remove minor imperfections, and changed the position of his own thumb, but otherwise he had no intention of changing any of the elements depicted in the original photograph taken by Mr. Schicchi, including the Hayden Work. Fletcher Decl. Exh. H-2 (Koons Tr. at 143-47)

**Response:** This is disputed. Koons corrected and adjusted the colors, resulting in a more golden, vibrant and glistening version of the original photographic image, or of the original Hayden Work. Fletcher Dec., Ex. H-3 at 143, 144, 149; Brooks Dec., Ex. A-3, at 135-36.

69. *Jeff in the Position of Adam* closely reproduces the colors, highlights, shadows, form, curvature, undulations, surface features, and surface markings of the Hayden Work's serpent and boulder. *Compare* Hayden Decl. Exh. A *with* Fletcher Decl. Exh. B (JK00018, JK00399).

**Response:** The colors in *Jeff in the Position of Adam* are totally different from the colors in the Hayden Work, as a comparison of Hayden Dec., Ex. A and Fletcher Dec., Ex. B (JK00018) clearly shows. Moreover, while Hayden claims that both the *Made in Heaven* billboard and *Jeff in the Position of Adam* closely reproduce the colors of the Hayden Work's serpent and boulder, a visual comparison of those two Koons works reveals that their colors are completely different: the billboard has a golden hue and the painting has a dark gray color. *Compare* Hayden Dec., Ex. B (JK00001) with Ex. B (JK00018.) Since the two works have completely different colors, it cannot be that both works closely reproduce the colors of the Hayden Work.

70. In creating *Jeff in the Position of Adam* based on photographs taken by Mr. Schicchi, Mr. Koons did not change the color, shape, surface markings, or shading of the original Hayden Work. Fletcher Decl. Exh. H-2 (Koons Tr. at 148-49).

**Response:** Mr. Koons had the colors and shading corrected and adjusted. Fletcher Dec., Ex. H-3, at 143, 144, 149. Also, the head of the snake in the Hayden Work is not visible in *Jeff in the Position of Adam*. Brooks Dec., Ex. A-3, at 121-22.

71. Mr. Koons testified that, in creating *Jeff in the Position of Adam*, he may have cropped the original photographic image, and engaged in light photoshop retouching to remove

minor imperfections, but otherwise his intention was to faithfully reproduce the original

photograph taken by Mr. Schicchi. Mr. Koons did not intentionally make any specific changes to

the Hayden Work.  Fletcher Decl. Exh. H-2 (Koons Tr. at 148-49).

**Response:**  Mr. Koons had the colors corrected and adjusted.  Fletcher Dec., Ex. H-3, at 143,

144, 149.  Also, the head of the snake in the Hayden Work is not visible in *Jeff in the Position of*

*Adam*.  Brooks Dec., Ex. A-3, at 121-22.

72.    The Koons sculpture *Jeff and Ilona (Made in Heaven)* reproduces the colors,

highlights, shadows, form, curvature, undulations, surface features, and surface markings of the

Hayden Work's serpent and boulder. *Compare* Hayden Decl. Exh. A *with* Fletcher Decl. Exh. B

(JK00397-98).

**Response:**  This is all disputed, as a comparison of the Hayden Work and the *Jeff and Ilona*

sculpture plainly demonstrates.  As Hayden admitted in his deposition, the works have totally

different color palettes and the form, curvature, undulations, surface features, and surface

markings of the snakes are completely different (Hayden's is inert and somber, curled up tightly

with its head near its body, without any tongue, and with cartoonish diamond-shaped scales

etched into the Styrofoam, whereas the snake in the Koons sculpture is dynamic, iridescent and

shiny, with a wide space between its head and body, a bright red twitching tongue, and realistic-

looking, overlapping scales, and is visible in the front and rear of the wooden sculpture, unlike

the Hayden Work, which had no such details in the rear).  The Koons sculpture also has distinct

rocks, flowers, and crashing waves of water that are not present in the Hayden Work.  Brooks

Dec., Ex. A-3, at 125-28; Ex. E, at JK00048; Fletcher Dec., Ex. H-3, at 150-53, 172-73; Ex. H-4,

at 208-11.

73.    In creating *Jeff and Ilona (Made in Heaven)* based on photographs taken by Mr.

Schicchi, Mr. Koons had his artisans add new colors and surface definition to the Hayden

Work's serpent and boulders; add a protruding red tongue to the serpent, place several colorful

flowers on the boulders, and add small crashing waves to the base of the Hayden Work. Mr.

Koons also had an additional serpent body made for the backside of his sculpture. *Compare*

Hayden Decl. Exh. A *with* Fletcher Decl. Exh. B (JK00397-98).

**Response**: Not disputed, but, in terms of evidence, the rear of the sculpture is depicted in

Brooks Dec., Ex. E, at JK00048 and in the Declaration of Jeff Koons dated October 5, 2022

("Koons Dec."), Ex. C.  The rear of the Hayden Work has no portion of his snake.  Hayden Dec.,

Ex. A.

74.      In creating the photographs taken by Mr. Schicchi from which the Infringing

Works were derived, Mr. Koons used the Hayden Work as a platform on which to pose with Ms.

Staller in sexual positions. Fletcher Decl. Exh. H-2 (Koons Tr. at 114-16).

**Response:**  Not disputed, except as to the term "Infringing Works."

75.      In organizing the photoshoots with Mr. Staller, Mr. Koons sought to recreate

faithfully Mr. Staller's world and accoutrements. Mr. Koons wanted to use Mr. Staller as a

"readymade," *i.e.*, a pure, essentialized idea of herself. He did not want to change anything about

Ms. Staller or her work. Rather he wanted to capture Mr. Staller's context and then insert himself

into that context.  Mr. Koons testified: "I wanted to be able to capture the quality of [Ms. Staller]

– of her being, of her – her sessions, the photographs that I've seen her in. I just wanted to

capture all that and to put myself in that context with her." Fletcher Decl. Exh. H-2 (Koons Tr. at

83-85) and Exh. C (JK00306-07).

**Response:**  Not disputed.

76.     Mr. Koons asked for the photo sessions with Ms. Staller to be similar to Ms. Staller's previous work, and for their sessions to be "just like any of the others [Ms. Staller had] done." Mr. Koons asked to use Ms. Staller's same photographer, assistants, stylists, technical support sets, costumes, and post-production workers. Mr. Koons "wanted [the final photographs] to have the look and feel of [Ms. Staller's] work." He wanted to appear with Ms. Staller in similar poses and settings to her normal work. In order to achieve final photographs that were just like the photographs Ms. Staller normally produced – to "capture [her] essence" – with similar creative decisions and process, he asked Ms. Staller and Mr. Schicchi to participate in choosing the final images. Fletcher Decl. Exh. H-2 (Koons Tr. at 82, 85-88, 92-93) and Exh. C (JK00306-07).

**Response:**  Not disputed.

77.     Mr. Koons perceived Ms. Staller's world to be one of surreal theatrical fantasy. He believed she symbolized both innocence and transgression of social norms. He believed she symbolized free and open sexuality, without guilt or shame. He understood that she sought to liberate people to be freer about their sexuality and she also wanted to shock people into feeling differently about themselves. He understood her erotic work to have both artistic and political purpose. He understood that she sometimes performed live with a snake, and that this was a symbol of transgression. Mr. Koons called Ms. Staller the "Eternal Virgin," intending to evoke themes of spirituality, transcendence and goodness. Fletcher Decl. Exh. H-1 (Koons Tr. at 50-57, 59, 64).

**Response:**  Not disputed.

78.     Mr. Koons shared Ms. Staller's values of self-acceptance, and the beauty of removing people's guilt and shame.  He wrote to her, "I view you as the greatest seductress in

the world today. Sensuality is a principal focus of my work, and you represent that quality magnificently." Fletcher Decl. Exh. H-1 (Koons Tr. at 56) and Exh. C (JK00306).

**Response:**  Not disputed.

79.    Through the *Made in Heaven* series, including the Infringing Works, Mr. Koons intended to bring about self-acceptance in his audience, and to address themes concerning the body and sexuality. He wanted to "remove the guilt and shame" of his audience. He sought to do this by inserting himself into Ms. Staller's world. Fletcher Decl. Exh. H-1 and H-2 (Koons Tr. at 71-72, 126-27). He testified:

> A:  There were aspects of Ilona that I wanted to be able to bring into the dialogue of my work. Things that I felt – certain things that she represented . . . a certain acceptance, not feeling guilt and shame . . . .
>
> Q:  Those were things that Ilona represented to you; is that fair?
>
> A:  Things that I would perceive in her, and things that I also – you know, ideas that I also had within myself that I wanted to embed in the Made in Heaven dialogue.
>
> Q:  And the[y] were things that she sought to represent in the world as well; is that fair to say?
>
> A:  Yes.
>
> Q:  And I think you said you wanted to insert yourself into those things?
>
> A:  Within the body of work that I wanted to create . . . I wanted to put myself into this other environment.
>
> Q:  Her environment?
>
> A:  Yes.

Fletcher Decl. Exh. H-3 (Koons Tr. at 206-07).

**Response:**  Not disputed, except as to the term "Infringing Works."

80.    Mr. Koons' intention and purpose for his use of Ms. Staller and her world remained consistent and unchanging throughout his time working with her and his creation of the *Made in Heaven* works, including the Infringing Works. Fletcher Decl. Exh. H-2 (Koons Tr. at 89).

**Response:**  Not disputed.

81.    Mr. Koons believes that "a work of art is always finished by the viewer. It's what [the viewer] bring[s] to the interaction with the work of art that completes it." Mr. Koons believes that, regardless of his intention as an artist, a viewer of his artwork might come away with a meaning that was different or not intended by him. Fletcher Decl. Exh. H-3 (Koons Tr. at 203-06).

**Response:**  Mr. Koons was not quite so categorical; he also testified, "Even though the viewer finishes a work of art, I always try to take a viewer to a certain vista and to show what my intentions are, and try to communicate those intentions. . . ."  Fletcher Dec., Ex. H-3, at 205.

First Factor, Part Two: Commercial Purpose

82.    Mr. Koons has stated on multiple occasions that the purpose and effect of the Infringing Works and his *Made in Heaven* series was to increase his own stardom, to gain larger cultural relevance as an artist, and to "participate [in a dialogue] on a larger cultural stage." Fletcher Decl. Exh. H-3 (Koons Tr. at 186-89).

**Response:**  Koons has more often stated that his purpose in creating the *Made in Heaven* series was to depict the story of Adam and Eve, without the shame and guilt evidenced in the famous

Masaccio fresco.  Fletcher Dec., Ex. H-1, at 53-57, 72; Ex. H-2, at 126-27; Ex. H-4, at 213, 216-17; Brooks Dec., Exs. D, E, F, G.

83.     In a live interview given on or about December 2, 2017 at the New Museum in New York City, Mr. Koons stated about the origins of Made in Heaven: "I had just finished my Banality exhibition, and at that point I kind of felt like I had become an art star . . . . But I didn't really feel like I was having any place in kind of the larger culture and not being viewed as . . . relevant, in American culture, you really have to be in the film or entertainment industry to be viewed as culturally relevant . . . . So I thought I'll just hire this woman . . . I'll just kind of montage myself into her images . . . and I thought I'll just put my own body in there and it'll be like we made a film, and I thought I'll call it Made in Heaven starring Jeff Koons and Cicciolina. I thought this way I would have another star on my shoulder . . . move past an art star, I'd be a film star. And that was the concept of that work." Fletcher Decl. ¶ 8 and Exh. G (Hayden000099 and referenced video at 0:37-1:10 and 2:00-2:45).

**Response:**  Not disputed.

84.     In an audio interview transcript published on the website of the Whitney Museum, Mr. Koons stated, "I thought, 'You know what I'll do? I'll create this billboard that's advertising a film. I'll call it Made in Heaven, and it'll be starring myself, Jeff Koons, and Cicciolina. It'll be like I became another star…." Fletcher Decl. Exh. G.

**Response:**  Not disputed.

85.     Mr. Koons testified that his purpose was to increase his own cultural relevance and to participate in a high-level cultural dialogue. Fletcher Decl. Exh. H-3 (Koons Tr. at 187-89).

**Response:**  This was not Mr. Koons's only purpose.  *See* Response to paragraph 82.

86.    The *Made in Heaven* series generated controversy and notoriety for Mr. Koons. Fletcher Decl. Exh. H-3 (Koons Tr. at 189-90).

**Response:**  The cited testimony does not support the statement that controversy and notoriety were generated "for" Mr. Koons.  As the cited testimony makes clear, that was not his intent.

87.    The Infringing Works sold to collectors for many hundreds of thousands of dollars. The three editions of the *Made in Heaven* Billboard sold for a total of approximately $262,500 in 1991 and 1993; *Jeff in the Position of Adam* sold for $90,000 in 1992; and *Jeff and Ilona (Made in Heaven)* sold for $440,000 thousand in 1991. Fletcher Decl. Exh. D.

**Response:**  Not disputed, except for the term "Infringing Works."

88.    Mr. Koons is currently worth more than $100 million. His income has been generated primarily from sales of his artwork. Fletcher Decl. Exh. H-3 (Koons Tr. at 194).

**Response:**  Mr. Koons's net worth is neither material nor relevant and the answer to that question was given following an objection by Mr. Koons's counsel.  *Id.*

Second Factor: Nature of the Copyrighted Work

89.    The Hayden Work is an expressive and creative "sculptural work of artistic craftmanship." *Hayden v. Koons*, 21 Civ. 10249, 2022 WL 2819364, at *3 (S.D.N.Y. July 18, 2022) (Schofield, J.) (ECF 38).

**Response:**  The Court held that the Hayden Work was a "sculptural work of artistic craftmanship" rather than a "useful article."  The words "expressive and creative" are Hayden's.

90.    Mr. Hayden has no information indicating that images or copies of the Hayden Work were ever distributed to the public, apart from their depiction by Mr. Koons in the Infringing Works. Hayden Decl. ¶ 20.

**Response:**  A simple Google search would have disclosed such "information":



*See* Brooks Dec., ¶ 11 (photo of Staller modeling at her studio in 1989, seated atop the Hayden Work, for her clothing line, the *Cicciolina Collection*.)

91.    Mr. Hayden never assigned or licensed to Diva Futura any portion of his exclusive rights under copyright law, including those rights relating to the making or distribution of copies, public display, or economic exploitation. Hayden Decl. ¶ 14; Ricolfi Report ¶ 9(ii) and (iii).

**Response:**  Hayden did give Diva Futura the right to publicly display his platform and to commercialize it; the whole point of the Hayden Work was to serve as a platform for Cicciolina's public displays of eroticism on film and public performances.  Complaint, ¶¶ 5, 28, 30.  The Ricolfi Report, aside from being irrelevant to issues of U.S. Copyright Law and dealing with issues of foreign law which are not considered to be facts under Fed. R. Civ. P. 44.1, also does not say anything about the right to publicly display the Hayden Work.

92.    The Hayden Work is an "unpublished" work, as that term is defined by United

States copyright law. 17 U.S.C. § 101; Hayden Decl. ¶ 20; Ricolfi Report ¶ 9(ii) and (iii).

**Response:**  Although the Hayden Work may not have been published under the technical

statutory definition, Hayden's relinquishment of his right to control the first public appearance of

his expression renders the work published for fair use purposes.  *Swatch Grp. Mgmt. Servs., Ltd.*

*v. Bloomberg, L.P.*, 756 F.3d 73, 88-89 (2d Cir. 2014).  The citation to the Hayden Declaration

adds nothing, stating only: "I have no information indicating that images or copies of the Hayden

work were ever distributed to the public, apart from their depiction by Mr. Koons in certain

derivative artworks create by Mr. Koons."  Mr. Hayden's lack of "information" does not make

the Hayden Work unpublished, especially because, apparently unbeknownst to Mr. Hayden,

images of his work had been distributed to the public when Cicciolina modeled in her studio in

1989, atop the Hayden Work, for a line of clothing.  See Brooks Dec., ¶ 11.  The citation to the

Ricolfi Report adds nothing, because fair use is not a matter of Italian law and Mr. Ricolfi is not

an expert on the meaning of "publication" for fair use purposes.

Third Factor: Amount and Substantiality of the Portion Used

93.    The Infringing Work *Jeff and Ilona (Made in Heaven)* incorporates a three-

dimensional rendition of 100% of the Hayden Work, and that rendition is a major focus –

comprising approximately 65% of the total volume – of Mr. Koons' derivative work. The

original surface markings and forms, coloring, cross-hatching on the serpent, and the precise

shape and curvature of Mr. Hayden's original serpent are all readily visible in *Jeff and Ilona*

*(Made in Heaven)*. *Compare* Hayden Exh. A *with* Fletcher Exh. B (JK00397-98).

**Response:**  Jeff and Ilona is not a "rendition of 100% of the Hayden Work"; it is a radically

different work containing a serpent with a much different shape, curvature, surface markings,

color, and cross-hatching, and is not a "major focus" of the sculpture.  As Hayden admitted, the

Hayden Work is but a "small" part of the Koons work.  Brooks Dec., Ex. A-3, at 130-32.

94.    The Infringing Work *Made in Heaven* Billboard incorporates a two-dimensional reproduction of approximately 80% of the front and side of the Hayden Work, which occupies approximately 40% of the entire *Made in Heaven* Billboard. The original surface markings and forms, coloring, cross-hatching on the serpent, and the precise shape and curvature of Mr. Hayden's original serpent are all readily visible in the *Made in Heaven* Billboard. *Compare* Hayden Exh. A *with* Fletcher Exh. B (JK00400-01).

**Response:**  There is no basis in the cited documents for the percentages arbitrarily cited in this paragraph.  Hayden admitted that the Hayden Work constitutes only a "small" portion of the Billboard.  Brooks Dec., Ex. A-3, at 130-32, 134-35.

95.    The Infringing Work *Jeff in the Position of Adam* incorporates a two-dimensional reproduction of approximately 60% of the front side of the Hayden Work, which occupies approximately 25% of the entire painting. The original surface markings and forms, coloring, cross-hatching on the serpent, and the precise shape and curvature of Mr. Hayden's original serpent are all readily visible in *Jeff in the Position of Adam*. *Compare* Hayden Exh. A *with* Fletcher Exh. B (JK00399).

**Response:**  The percentages are arbitrary and not supported by the cited documents.  The head of the snake in the Hayden Work is not visible in *Jeff in the Position of Adam*.  Brooks Dec., Ex. A-3, at 120-22.  The colors are completely different.

96.    The original surface markings and forms, coloring, cross-hatching on the serpent, and the precise shape and curvature of Mr. Hayden's original serpent are all readily visible in each of the Infringing Works. *Compare* Hayden Exh. A *with* Fletcher Exh. B (JK00397-401).

**Response:**  In *Jeff and Ilona*, the shape and curvature of the snake are radically different than in

the Hayden Work and the surface markings and cross-hatching of the serpent's scales are

dramatically different. The coloring in the Hayden work differs from the coloring in all three of

the *Made in Heaven* series works.

97.     When Mr. Koons first decided to incorporate the Hayden Work into his

photoshoots with Ms. Staller, he did not intend to evoke any "Garden of Eden" themes. Rather,

the inclusion of the Hayden Work into the photoshoots with Ms. Staller occurred as a

coincidence: the Hayden Work was a part of Ms. Staller's sets, and it had a useful height and

color for Mr. Koons' purposes. Fletcher Decl. Exh. H-4 (Koons Tr. at 210).

**Response:**    Creating images of Adam and Eve (in the Garden of Eden, necessarily) was

always Mr. Koons's purpose. *See* Response to paragraph 82. While the inclusion of Hayden's

platform with its snake (as opposed to some other prop in Staller's studio) in certain of the

original photos taken by Mr. Schicchi may have been fortuitous or coincidental, once Mr. Koons

began conceptualizing *Jeff and Ilona*, he "started to design and transform that base into [his]

artwork," making the base taller with greatly increased space between the snake's head and

body, adding crashing waves, rocks and flowers and Baroque details to the serpent, including

realistic-looking overlapping scales instead of the cartoonish diamond-shaped scales Hayden had

etched into the Styrofoam, a bright red flicking tongue, and iridescent new colors, all evoking

Adam and Eve in the Garden of Eden.  Fletcher Dec., Ex. H-4, at 208-11; Ex. H-3, at 150-53,

172-73.

98.     Out of approximately 30 artworks in Mr. Koons' *Made in Heaven* series, only six

of those works depicted the Hayden Work in any form. The majority of the *Made in Heaven*

artworks did not depict the Hayden Work. Fletcher Decl. Exh. H-4 (Koons Tr. at 212).

**Response:**  Not disputed.

99.     Each of the artworks in the *Made in Heaven* series share similar themes relating – according to Mr. Koons – to Adam and Eve, emancipation from the shame of sexuality, and highlighting cultural hypocrisy around sexuality. Mr. Koons believed he was able to communicate these themes without depicting the Hayden Work. Fletcher Decl. Exh. H-4 (Koons Tr. at 212-14).

**Response:**  Not disputed.

100.     Mr. Koons testified that, in order for a viewer to perceive his intended Garden of Eden theme, "you have to look at kind of the whole body of work together."  Mr. Koons believes that the Garden of Eden theme in his *Made in Heaven* artworks is embodied in and apparent from the artworks' depiction of rocks, flowers, crashing waves (evoking life emerging from the sea, *i.e.*, Evolution), a "fabulous snake that [Mr. Koons] created," and a man and woman engaging in sexual acts. Mr. Koons also believes the Garden of Eden theme is evoked by his use of the subtitle "Kama Sutra" in several of the artworks. Fletcher Decl. Exh. H-4 (Koons Tr. at 214, 216-17).

**Response:**  Not disputed.

<u>Fourth Factor: Market Effects</u>

101.     Mr. Hayden created and sold multiple, creative works to Mr. Schicchi and Diva Futura. He also created and sold artworks and creative projects to other clients, including collectors and retail establishments. Hayden Decl. ¶¶ 7-8.

**Response:**  *See* Response to Paragraph 10.

102.     Diva Futura was a potential derivative licensing market for the Hayden Work. Under Italian law, Diva Futura would have been required to obtain a license to reproduce or

create derivative versions of the Hayden Work, or to exploit the Hayden Work economically.
Ricolfi Report ¶ 9(ii) and (iii).

**Response:** Diva Futura was not a potential derivative licensing market for the Hayden Work,
which Diva Futura owned and had the right to commercialize. Complaint, ¶ 30. And, anyway,
Koons, who paid Diva Futura, was not usurping Hayden's supposed Diva Futura market by
pocketing licensing fees Diva Futura would otherwise have paid to Hayden. The Ricolfi Report
opining on Italian law may not be considered under Fed. R. Civ. P. 44.1 because foreign law is a
question of law, not of fact.

103.    Mr. Koons, as an individual who wanted to perform actual or simulated sex acts
with Ms. Staller on top of the Hayden Work in connection with the creation of derivative works,
was himself a potential licensing market for the Hayden Work. Ricolfi Report ¶ 9(iv).

**Response:** Mr. Koons was not a potential licensing market for the Hayden Work. *Bill Graham
Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 614 (2d Cir. 2006) (quoting 4 Melville B.
Nimmer & David Nimmer, *Nimmer on Copyright*, § 13.05[A][4]). The Ricolfi Report, opining
on foreign law, may not be considered under Fed. R. Civ. P. 44.1. *See Animal Science Products,
Inc. v. Hebei Welcome Pharmaceutical Co. Ltd.*, ___ U.S. ___, 138 S. Ct. 1865, 1873 (2018).

104.    Mr. Hayden believes that, due to Mr. Koons' celebrity and public appropriation of
the Hayden Work, Mr. Hayden has lost the ability to claim uncontested authorship and copyright
ownership of the Hayden Work. Mr. Hayden believes that, if he were to desire or attempt to
exploit the Hayden Work in the future, he would be impeded from doing so because potential
third party buyers and licensors are likely to accept Mr. Koons' claims of authorship and
copyright ownership rather than Mr. Hayden's. Hayden Decl. ¶ 21.

**Response:** This directly contradicts Mr. Hayden's deposition testimony, given in response to a

question from his own counsel on redirect examination:

Q:    Do you believe there would be a reason why someone would think that you did

not create it?

A:    No.

Q:    Okay.

A:    No. Because I have people who can verify that I did make it and plus, you know,

photographs and stuff that I have at the time.

Brooks Dec., Ex. A-4, at 203.

<u>The Infringing Works are not Works of Parody</u>

105.    Mr. Koons intended the Infringing Works to be earnest and serious works. He did

not intend them to evoke deliberate comedy. He did not intend to make fun of Ms. Staller, her

world, her performances, her sets, the Hayden Work, or the media. He did not intend to make fun

of or to criticize Masaccio's painting *Expulsion from the Garden of Eden*. Fletcher Decl. Exh. H-

4 (Koons Tr. at 217-19).

**Response:** Not disputed, except that, although Mr. Koons did not mean to criticize Masaccio's

painting, he did want to create a counter-narrative, removing the guilt and shame that were so

evident on the faces of Adam and Eve in the Masaccio work.  Fletcher Dec., Ex. H-2, at 126-27;

Ex. H-1, at 72; Brooks Dec., Ex. E, at JK00049.

**<u>Mr. Koons Has Previously Been Sued for Copyright Infringement</u>**

106.    Prior to this lawsuit, Mr. Koons was familiar with the legal concepts of copyright

infringement and the fair use defense. Fletcher Decl. Exh. H-1 (Koons Tr. at 36-39).

**Response:** Not disputed.

107.    Mr. Koons has been sued for copyright infringement multiple times in the United States and abroad. In several of the U.S.-based cases, Mr. Koons has invoked fair use as a defense to copyright infringement. *See, e.g.*, *Rogers v. Koons*, 920 F.3d 301 (2d Cir. 1992); *United Features Syndicate, Inc. v. Koons*, 817 F. Supp. 370 (S.D.N.Y. 1993); *Blanch v. Koons*, 467 F.3d 244 (2d Cir. 2006); Fletcher Decl. Exh. H-1 (Koons Tr. at 37).

**Response:** Not disputed.

108.    Past copyright lawsuits in U.S. federal courts involving Mr. Koons as a defendant include: *Rogers v. Koons*, 920 F.3d 301 (2d Cir. 1992); *United Features Syndicate, Inc. v. Koons*, 817 F. Supp. 370 (S.D.N.Y. 1993); *Campbell v. Koons*, 91 Civ. 6055, 1993 WL 97381 (S.D.N.Y. Apr. 1, 1993); *MGM-PATHE Commun's Co. v. Koons*, 91 Civ. 4852 (S.D.N.Y.); *Blanch v. Koons*, 467 F.3d 244 (2d Cir. 2006); and *Gray v. Koons*, 15 Civ. 9727 (S.D.N.Y.).

**Response:** Not disputed.

109.    The lawsuits *Rogers v. Koons* and *United Features Syndicate v. Koons* were filed in or about 1989. Mr. Koons was aware of the concept of copyright infringement at least as early as 1989. *See* 89 Civ. 6707 (S.D.N.Y.); 89 Civ. 8067; Fletcher Decl. Exh. H-1 (Koons Tr. at 39).

**Response:** Not disputed. *Rogers v. Koons* was filed on October 11, 1989 and *United Features Syndicate v. Koons* was filed on December 6, 1989.

**Mr. Hayden Has Registered His Copyright in the Hayden Work**

110.    On August 7, 2019, though his attorney, Mr. Hayden filed an application for copyright registration of the Hayden Work, a sculpture created by Mr. Hayden in 1988 and entitled *Il Serpente for Cicciolina*, with the U.S. Copyright Office. Hayden Decl. ¶ 22 and Exh. B.

**Response:** Not disputed.

111.    The Copyright Office granted Mr. Hayden's application on January 10, 2020 and issued a Certificate of Registration with Registration Number VAu 1-380-397, effective August 7, 2019. The registration does not did not identify a date of first publication, nor did does it state that the Hayden Work was ever published. Hayden Decl. ¶ 22 and Exh. B.

**Response:**  Not disputed.

## DEFENDANTS' RULE 56.1 STATEMENT

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1, Defendants respectfully submit this statement of material facts as to which there are no genuine issues to be tried:

1.    As Plaintiff acknowledged in his deposition, the Hayden Work is not a major or dominant part of the *Made in Heaven* artworks ("Koons Artworks"), and is, in fact, only a "small" part of those works.  Brooks Dec., Ex. A-3, at 130-32, 134-35.

2.    The rocks in the Hayden Work are not visible in the *Made in Heaven* billboard, and the head of the snake in the Hayden Work is not visible in *Jeff in the Position of Adam*. *Id*. at 120-22.

3.    The snake in the Hayden Work has no tongue whereas the snake in the *Jeff and Ilona* wood sculpture has a bright red tongue and is iridescent and shiny, unlike the snake in the Hayden Work.  *Id*. at 126-28.  The Hayden Work and *Jeff and Ilona* have different color palettes. *Id*. at 126.

4.    The scale of the Koons Artworks is larger than the Hayden Work and the media are "completely different."  *Id*. at 123-24, 129-30.

5.    The *Made in Heaven* billboard has colors that are more "golden," "vivid," "dynamic," and less "somber" than those in the Hayden Work and boulders and a snake that are more "glistening" than in the Hayden Work.  *Id*. at 135-36.

6.      The color of the snake and boulder in the *Made in Heaven* billboard and in *Jeff in the Position of Adam* are different.  *Compare* Fletcher Dec., Ex. B, at JK00001 with Ex. B, at JK00018.

7.      As Plaintiff admitted in his deposition, the Hayden Work and the Koons Artworks had meanings that were "opposite."  Brooks Dec., Ex. A-3, at 140-41.

8.      As Plaintiff admitted in his deposition, the purpose of the snake in the three Koons Artworks was to symbolize "the Adam and Eve story," whereas the snake in the Hayden Work did not "represent the serpent who tempted Eve in the Garden of Eden."  Id. at 142-43.

9.      Plaintiff sold the Hayden Work (the only copy he had), which was made from a block of Styrofoam, to Diva Futura in 1988 for $900.  Brooks Dec., Ex. A-1, A-2, at 27, 41, 52, 66-67.

10.     Plaintiff testified in his deposition that he did not wish, either in 1988 or at any time up until the present, to sell another copy of the Hayden Work.  *Id*. at 79, 80-81, 92-93.

11.     Plaintiff testified in his deposition that, had he wished to sell another copy of the Hayden Work, the only way he could have replicated the Hayden Work was by getting another block of Styrofoam and carving it again as he had done with the original block.  *Id*. at 67,80.

12.     If Diva Futura had not bought the Hayden Work, Plaintiff testified that he did not have another potential purchaser in mind.  *Id*. at 68-69.

13.     When he designed the Hayden Work, which was low enough to be "easy to step onto," Plaintiff had Cicciolina "in mind," and when he sold his only copy of the Hayden Work to Diva Futura, Plaintiff knew and intended that it would be used as a platform on which Cicciolina would perform erotic acts both on film and before live audiences, who would be charged admission.  *Id*. at 56, 60, 66, 74; Complaint, ¶ 5.

14.    Plaintiff understood and intended that the Hayden Work "would be used commercially by . . . Cicciolina, Diva Futura and Mr. Schicchi."  Complaint, ¶ 30.

15.    Plaintiff never again saw the Hayden Work after he sold it to Diva Futura in 1988, made no effort to control its first public appearance, did not even know that Cicciolina had modeled for a line of clothing in her studio in Rome in 1989 seated on the Hayden Work (Complaint, ¶ 59; Hayden Dec., ¶ 20; Brooks Dec., ¶ 11) and does not know its present whereabouts.  Brooks Dec., Ex. A-2, at 75-77.

16.    Plaintiff never asked that Diva Futura credit him if his platform was used in one of Cicciolina's films or live performances.  *Id*. at 78.

17.    Koons requested that Staller and Diva Futura tell him if they wanted anyone to be credited and did, in fact, credit Schicchi as the photographer on the *Made in Heaven* billboard. Fletcher Dec., Ex. C, at JK00307, JK00364, ¶ 10; Ex. H-2, at 89, 97; Ex. H-3, at 141, 168. Koons testified that he would have credited anyone that Diva Futura wished to have credited (Fletcher Dec., Ex. H-2, at 89), credited Schicchi as the photographer because he was asked to, and was never informed to credit anyone other than Schicchi.  *Id*. Ex. H-3, at 141, 165.

18.    Plaintiff did not register a copyright for the Hayden Work until 2019, and, then, only so he could bring this lawsuit.  *Id*. Ex. H-4, at 192.  He never registered a copyright for any other work that he created.  *Id*. Ex. A-1, at 43.

19.    Even though the Complaint alleged that a market existed for "leveraging his copyrights" (Complaint, ¶ 62), Plaintiff admitted in his deposition that he did not know how he could leverage his unregistered copyrights.  Brooks Dec., Ex. A-2, at 90.  Nor did he know who a potential buyer for a replica of the Hayden Work would be, if he made one from another block of

Styrofoam.  Brooks Dec., Ex. A-2, at 67, 80-81.  He also testified that he was "not interested in selling this thing [the Hayden Work].  I'm interested in doing other things."  *Id*. at 93.

20.     Plaintiff testified that he never tried to exploit any existing or potential market for the Hayden Work or its derivatives and never tried to license merchandising rights to his work. *Id*. at 78-79.

21.      Plaintiff admitted in his deposition that the existence of the *Made in Heaven* artworks had not damaged his career (*id*. at 93) and conceded that no one had ever told him that they would not buy his works or license rights from him because of Koons's allegedly infringing artworks.  *Id*. at 88-89.

22.     Plaintiff speculated that the controversy emanating from this lawsuit might spark some interest in his previously unknown work.  *Id*. at 79, 88.

23.     Koons entered into a contract with Staller, Schicchi and Diva Futura specifying that Schicchi would do a photo shoot of Staller and Koons employing Staller's existing sets and giving Koons the right to utilize Schicchi's photographs as his exclusive property in any manner or form he chose; Koons planned to use the photos to create the *Made in Heaven* artworks. Fletcher Dec., Ex. C, at JK00362-00364; Ex. H-2, at 95-96.

24.     According to Koons, the Whitney Museum of Modern Art, and numerous press reports, the purpose of the *Made in Heaven* series was to depict Adam and Eve emancipated from the guilt and shame of nakedness and sex.  Fletcher Dec., Ex. H-1, at 53-57, 59, 72; Ex. H-2, at 116, 126-27, 133, 137; Ex. H-3, at 145; Ex. H-4, at 213, 216-17; Brooks Dec., Ex. B, at 3-4, Ex. C, at 24, Ex. D, at JK00041-00042; Ex. E, at JK00047-00049l; Ex. F, at JK00068-00070; Ex. G; Ex. H.

25.    The *Made in Heaven* series constructed a counter-narrative to Masaccio's fresco of Adam and Eve being banished from the Garden or Eden in shame and humiliation and borrowed Baroque techniques, including from Michelangelo and Bernini.  Fletcher Dec., Ex. H-2, at 126-27; Brooks Dec., Ex. D, at JK00041-JK00042; Ex. E, at JK00047, JK00049, Ex. F, at JK00069-00070; Ex. G.  Koons employed woodcarvers from Ortisei, Italy, who, working in the tradition of the church "to embed a spiritual quality [into the depiction] of Adam and Eve," fabricated the polychromed wood sculpture *Jeff and Ilona* under Koons's close supervision. Fletcher Dec., Ex. H-2, at 109, 133, 137-38; Koons Dec., Ex. B, at JK00147-00157.

26.    The *Made in Heaven* billboard, based on a photo taken by Cicciolina's manager and photographer, Riccardo Schicchi, was stylized to resemble an ad for a film of that title starring Cicciolina and Koons.  Koons Dec., ¶ 3; Fletcher Dec., Ex. H-2, at 106-07.  Koons decided not to make the film, but fell in love with and later married Staller, returning to Italy for more photo shoots, from which the balance of the *Made in Heaven* series was created.  Brooks Dec., Ex. B, at 3.

27.    Koons chose Staller (paying her and her studio) (Fletcher Dec., Ex. C, at JK00363)) to portray Eve because she was transgressive and yet innocent (Fletcher Dec., Ex. H-1, at 54-56) and "very open about sex . . . and her sexuality" and "seemed very free of. . . guilt and shame, which I was very interested in, in trying to use my own art to help people have self-acceptance and remove any type of guilt and shame that people carry in their own lives."  *Id*. at 53.

28.    Having hired Staller, Koons wanted to present her exactly as she appeared in her erotic performances. *Id*. Ex. H-2, at 82-85, 87-88; *id*. Ex. C, at JK00306.  To capture the recognizable essence of the famous porn actress, to "make a precise reference" to her as a kind of

"readymade," it was necessary for Koons to be able to use Staller's authentic sets, props, costumes, and photographer.  *Id.* Ex. H-2, at 83-85.

29.    By depicting Staller on her authentic sets and in her normal working environment, including atop Hayden's platform, the *Made in Heaven* series blurred the line between art and pornography (Brooks Dec., Ex. H) and, because the famous porn star had become the artist's lover, the line between art, life and the media (Brooks Dec., Ex. C, at 25), while also testing the boundaries between art and mass culture and the relationship of artists to celebrity (Brooks Dec., Ex. B, at 1).

30.    Hayden claims he did not find out about Koons's artworks until 2019 when he chanced upon an article in *la Repubblica* when he was living in Nicaragua.  Hayden was residing in Rome when the Koons works premiered in Venice in 1990, causing a "media sensation and scandal" (Complaint, ¶ 10), and when, a few years later, another scandal erupted over the divorce and child custody battle being waged in an Italian court between Mr. Koons and Cicciolina.  Mr. Hayden, who resided in Italy until 2007 and consumed Italian newspapers and television news (Brooks Dec., Ex. A-1, at 18, 31-34), became aware of the sensational lawsuit between Mr. Koons and Cicciolina because it was "in all the newspapers" and on television.  *Id.* Ex. A-2, at 110-12.  The surrounding publicity – which inevitably must have mentioned the couple's then-recent controversial artistic collaboration – put Mr. Hayden on inquiry notice of Mr. Koons's alleged copyright infringement of the Hayden Work.

Dated:  New York, New York
         October 5, 2022

Respectfully submitted,

SCAROLA ZUBATOV SCHAFFZIN PLLC

By: _____
       Daniel J. Brooks
620 Fifth Avenue, 2nd Floor
New York, New York 10020
Tel.: (212) 757-0007
Fax: (212) 757-0469
Email: dbrooks@szslaw.com

*Attorneys for Defendants Jeff Koons and*
*        Jeff Koons LLC*